HENRY MASON, APPELLEE AND CROSS-APPELLANT, V. ROBERT E.
SCHUMACHER AND ALBERTA A. SCHUMACHER, HUSBAND AND
WIFE, APPELLANTS AND CROSS-APPELLEES.

439 N.W.2d 61

Filed April 27, 1989.   No. 87-194.

I

Jeffrey A. Silver, of Silver and Wieland, for appellants.

Edward F. Pohren, of Dwyer, Pohren, Wood, Heavey & Grimm, for appellee.

BOSLAUGH, WHITE, SHANAHAN, AND FAHRNBRUCH, JJ., and WITTHOFF, D.J.

SHANAHAN, J.

In the county court for Douglas County, Henry Mason filed two petitions against Robert E. and Alberta A. Schumacher, Mason's former landlords, and sought (1) damages for conversion of his personal property and (2) liquidated and actual damages for unlawful ouster and wrongful withholding of his security deposit, pursuant to Nebraska's Uniform Residential Landlord and Tenant Act (URLTA), Neb. Rev. Stat. §§ 76-1401 et seq. (Reissue 1986). Schumachers cross-claimed for past-due rent and repairs to their duplex which had been rented to Mason. The county court consolidated the actions for trial, held that Mason had abandoned the leased premises with all his personal property on the premises when the abandonment occurred, and dismissed Mason's petitions. Also, the county court awarded judgment to Schumachers for $395, or 1 month's rent.

Pursuant to Neb. Rev. Stat. § 24-541.06 (Reissue 1985), Mason appealed to the district court, which, after finding that Mason had not abandoned the leased premises, held that (1) the county court's dismissal of Mason's conversion action was erroneous; (2) Mason was entitled to his security deposit less Schumachers' cost of repairs to the premises and delinquent rent due Schumachers; (3) Schumachers were not entitled to costs incurred in removing Mason's belongings from the premises; and (4) Mason was not entitled to damages for unlawful ouster. The district court, therefore, reversed the

decision of the county court and remanded the case for further proceedings in Mason's conversion action. Schumachers appeal and Mason cross-appeals.

## STANDARD OF REVIEW

All actions involved in this appeal are law actions in a bench trial before the county court.

On appeal of a county court's judgment rendered in a bench trial of a law action, the district court reviews the "case for error appearing on the record made in the county court." Neb. Rev. Stat. § 24-541.06 (Reissue 1985). A county court's factual findings in a bench trial of a law action have the effect of a verdict and will not be set aside unless such findings are clearly erroneous.

*Holden v. Urban*, 224 Neb. 472, 474, 398 N.W.2d 699, 701 (1987).

As appellate courts, reviewing a judgment in a bench trial of a law action in the county court, the Supreme Court and a district court do not reweigh evidence, but consider the judgment in the light most favorable to the successful party and resolve evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. See *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986).

## THE MOTLEY AND MULTIFORM UNIFORM RESIDENTIAL LANDLORD AND TENANT ACT

Before a detailed factual background for the questions of first impression in this appeal, we observe that the Nebraska Legislature, in 1974, enacted the URLTA to "simplify, clarify, modernize, and revise" landlord-tenant law, as well as "[t]o make uniform the law among those states which enact" URLTA. § 76-1402. However, notwithstanding the statutory objective mentioned in § 76-1402, we note that the Uniform Residential Landlord and Tenant Act, approved by the National Conference of Commissioners on Uniform State Laws, has 43 sections which contain substantive provisions relevant to the landlord-tenant relationship for residential real estate and that 30 of those 43 sections have been amended by or deleted from the Nebraska act. See Unif. Residential Landlord and Tenant Act §§ 1.101 et seq., 7B U.L.A. 427 et seq. (1972).

Nevertheless, § 76-1403 provides that "[u]nless displaced by the provisions of [URLTA], the principles of law and equity . . . supplement its [URLTA's] provisions."

Section 76-1405(2) governs remedies under URLTA: "Any right or obligation declared by [URLTA] is enforceable by action unless the provision declaring it specifies a different and limited effect."

URLTA also relates to security deposits and their return by the landlord:

> (2) Upon termination of the tenancy property or money held by the landlord as prepaid rent and security may be applied to the payment of rent and the amount of damages which the landlord has suffered by reason of the tenant's noncompliance with the rental agreement or section 76-1421 [tenant to maintain dwelling]. The balance, if any, and a written itemization shall be delivered or mailed to the tenant within fourteen days after demand and designation of the location where payment may be made or mailed.
>
> (3) If the landlord fails to comply with subsection (2) the tenant may recover the property and money due him and reasonable attorney's fees.

§ 76-1416.

Section 76-1421(2) provides that a tenant shall "upon termination of the tenancy place the dwelling unit in as clean condition, excepting ordinary wear and tear, as when the tenancy commenced."

According to § 76-1424, "the tenant shall occupy his dwelling unit only as a dwelling unit."

Regarding a tenant's remedies for unlawful ouster by the landlord and return of a security deposit, § 76-1430 states:

> If the landlord unlawfully excludes or removes the tenant from the premises . . . the tenant may recover possession or terminate the rental agreement and, in either case, recover an amount equal to three months' periodic rent as liquidated damages, and a reasonable attorney's fee. If the rental agreement is terminated the landlord shall return all prepaid rent and security recoverable under section 76-1416.

A landlord's remedy for a tenant's nonpayment of rent is found in § 76-1431(2):

> If rent is unpaid when due and the tenant fails to pay rent within three days after written notice by the landlord of nonpayment and his intention to terminate the rental agreement if the rent is not paid within that period of time, the landlord may terminate the rental agreement.

A tenant's abandonment of leased premises is mentioned in § 76-1432(3), which provides:

> If the tenant abandons the dwelling unit, the landlord shall take immediate possession and shall make reasonable efforts to rent it at a fair rental. If the landlord rents the dwelling unit for a term beginning prior to the expiration of the rental agreement, it is deemed to be terminated as of the date the new tenancy begins. *Total absence from the premises without notice to landlord for one full rental period or thirty days, whichever is less, shall constitute abandonment.*

(Emphasis supplied.) The last sentence of § 76-1432(3) is not part of the uniform act drafted at the national level, but was added, and is apparently uniquely indigenous, to the Nebraska act. Quite obviously, § 76-1432(3) does not specify the form or content of a tenant's notice to the landlord in reference to the statutory abandonment by absence from the premises.

Section 76-1434 abolishes "[d]istraint for rent," that is, the extrajudicial remedy of a landlord's seizure and detention of a tenant's personal property until delinquent rent is paid, and provides that a landlord's lien or security interest in a tenant's household goods is not enforceable.

Section 76-1436 limits the landlord's rights to recover possession of rented premises: "A landlord may not recover or take possession of the dwelling unit by action or otherwise . . . except in case of abandonment, surrender, or as permitted in [URLTA]."

## THE FACTS

Under a month-to-month oral lease entered in October of 1984, Henry Mason began renting one-half of Schumachers' duplex for $395 per month. Mason used the duplex as the residence for himself; his daughter, Carolyn Brown; and her

two children. The premises actually consisted of two separate living quarters; Mason lived in the upstairs "apartment," while his daughter lived in the basement "apartment." Mason paid his monthly rent through April 1986.

Some months before May 1986, Mason found another rental residence which was about the same size as Schumachers' duplex at a rent substantially less. Mason and his daughter decided to move to this recently found residence. As the result of Mason's delinquent payment for natural gas, Metropolitan Utilities District (MUD) discontinued gas service for Mason at the duplex on April 1, 1986. On April 15, Carolyn Brown completed a change-of-address card for postal service and designated May 4, 1986, as the effective date for the change in postal service and discontinuance of mail at the duplex, but the card was not received by Mason's postal carrier until mid-May. On April 24, in view of the delinquent water bill for the duplex, MUD discontinued water service to the Mason residence. Mason and his daughter used water from a neighbor's house and continued to live in the duplex despite the absence of gas and water service for their dwelling. Before moving from the duplex, Carolyn Brown attempted to contact the Schumachers "[f]our or five times" by telephone to tell them of the planned move, but her efforts were unsuccessful.

On May 7, Mason borrowed a truck and, with the help of two friends, began moving his and his daughter's possessions out of the Schumacher duplex. Mason had moved "a majority of the stuff from upstairs," but had not begun removing items from the basement, when rain suspended Mason's moving from the duplex. Consequently, although he had moved a good deal of his belongings, Mason left several items inside the duplex, including two new radial tires; four spare tires with rims; tools in a toolbox; two mattresses and box springs; three washing machines; a dryer; a stove; a refrigerator; two movie projectors; a dinette set; three vacuum cleaners; various pots, pans, and dishes; a crockpot; four fishing rods with reels; two pairs of boots; four leather jackets; and assorted items of clothing, and left a 1969 Chevrolet pickup truck on the premises. Many of those articles were purchased by Mason at "secondhand" stores. Mason never lived in the duplex after

May 7.

On May 9, Schumachers went to their duplex with the intention of collecting the May rent from Mason. On approaching the residence, Alberta Schumacher noticed that there were no curtains in the duplex's windows and mentioned to her husband, "Bob, the dog is gone," referring to Mason's little dog, which had always been playing in the front yard when Schumachers visited the duplex. Using his own set of keys, Robert Schumacher tried to enter the duplex, but found that his keys did not work in the locks. Robert Schumacher then removed a glass pane in the front door and reached inside to open the door for entry into the duplex.

Before entering the duplex, Schumachers had unsuccessfully attempted to phone Mason at his place of employment. Schumachers had then called MUD and learned that the water service for the duplex was terminated on April 24. On entering the duplex, Schumachers discovered that the place was in a state of disarray. While Robert Schumacher referred to Mason's property in the house as "trash," Schumachers, nevertheless, left a note in the duplex, directing Mason and his daughter to "pick up their items by May 12th, or we'd take them [the items] to the dump." Notwithstanding the time limit indicated in Schumachers' note, disposal of Mason's property began on May 9, when Robert Schumacher's brothers brought a pickup truck to the duplex and hauled away a gas range and a washing machine which had been in the basement of Mason's residence.

Schumachers "couldn't reach" Mason between May 9 and May 12, although their unsuccessful communicative efforts are not detailed in the record. On May 12, Schumachers returned to the duplex and saw that Mason's belongings were still in the duplex. Enlisting the aid of their daughter and two of Robert Schumacher's brothers, Schumachers removed all the remaining Mason belongings and took those items to the Douglas County landfill. Schumachers also called the Omaha police automobile impoundment division and requested that police tow away Mason's pickup, which was subsequently sold at public auction for $120. The city of Omaha received the proceeds from the sale of Mason's pickup.

Also on May 12, 1986, Carolyn Brown finally established

contact with Alberta Schumacher. When Brown told Mrs. Schumacher that she and Mason were going to remove the remainder of their personal property from the duplex, Mrs. Schumacher informed Brown that it was "too late" because all the belongings had been taken to the dump. Brown then went to the duplex to verify what Mrs. Schumacher had said and was unable to enter the premises because the doorknob had been removed. According to Robert Schumacher, however, the duplex was accessible on May 12 despite the absence of doorknobs, and he changed the duplex's locks on May 14.

During the week after removal of Mason's belongings, Schumachers attempted to clean and repair the duplex for reletting to another tenant. A number of window screens were replaced, the bathrooms were cleaned, holes in the walls were patched, a kitchen cabinet was fixed, and the garage door was repaired. By May 15, 1986, Mason had retained a lawyer, who wrote Schumachers and demanded return of Mason's security deposit, which the lawyer's letter indicated was $395. While Robert Schumacher knew about legal actions to recover possession of the duplex, he did not seek any legal remedy because he believed Mason had abandoned the duplex. Schumachers leased the duplex to a new tenant sometime at the end of May.

## MASON'S LAWSUITS

Carolyn Brown assigned her conversion cause of action to Mason, whose conversion petition alleged that, without Mason's consent, Schumachers "forcibly entered the dwelling and removed numerous items of personal property" belonging to Mason "and have . . . detained, used and disposed of said items of property and otherwise treated such property as their own in derogation of [Mason's] rights," resulting in damage of $9,500. In his URLTA petition, Mason alleged that Schumachers "unlawfully ousted and excluded" him from the duplex, and claimed liquidated damages of $1,185, the trebled monthly rent, plus a reasonable attorney fee pursuant to § 76-1430. Mason also alleged that he had demanded his security deposit and that Schumachers had refused to return the deposit. At trial, however, Mason testified that he could not remember the amount of the security deposit. Robert

Schumacher testified that the security deposit was $181. However, no one testified that Schumachers failed to return Mason's security deposit. Although Schumachers' alleged expenses for cleanup and repair in the amount of $248, the only proof of Schumachers' expenses was $75 to remove Mason's belongings from the duplex, $60.45 for repair to the garage door of the duplex, and $40 to clean the duplex's interior.

## COUNTY COURT'S DECISION

The county court determined that Mason's belongings left at the duplex were "of no utilitarian value and consisted of garbage trash, junk and worthless worn-out items," and concluded that Mason had abandoned the leasehold and his belongings, precluding Mason's conversion and ouster actions against Schumachers. The county court dismissed Mason's petitions and awarded a $395 judgment to Schumachers on their cross-petition.

## APPEAL TO THE DISTRICT COURT

On Mason's appeal, the district court reversed the county court's decision. Referring to § 76-1432(3), which provides that "[t]otal absence from the premises without notice to landlord for one full rental period or thirty days, whichever is less, shall constitute abandonment," the district court held that Mason had not abandoned the leasehold when Schumachers removed Mason's belongings, but concluded that Mason was not entitled to liquidated damages under URLTA because he had already rented another residence at the time of Schumachers' activity in question. Consequently, the district court reversed the county court's dismissal of Mason's conversion petition and remanded the cause for further proceedings in the conversion action. The district court further held that Mason was entitled to his $181 security deposit, less any delinquent rent and Schumachers' expense in cleaning the duplex. The district court disallowed Schumachers' claim for expenses in hauling Mason's property to the dump.

## ASSIGNMENTS OF ERROR

Schumachers appeal to this court, contending that the district court erred in concluding that URLTA provides "the exclusive definition of abandonment by the tenant" and that the district court erred in finding that Schumachers had

converted Mason's property. Mason cross-appeals, claiming that the district court erred in its refusal to award liquidated damages and an attorney fee under §§ 76-1430 (unlawful ouster) and 76-1416(3) (unreturned security deposit) and in its conclusion that Mason was liable for cleanup costs incurred by Schumachers.

## THE MEANING OF ABANDONMENT: STATUTORY OR COMMON LAW?

Mason contends that abandonment by a tenant's 30-day absence, specified in § 76-1432(3), supersedes and excludes the common law pertaining to abandonment of leased residential premises. On the other hand, Schumachers maintain that the common law concerning abandonment applies during the first 30 days of a tenant's absence and that the statutory abandonment of § 76-1432(3) becomes conclusive after a tenant's 30-day absence.

As noted, URLTA does not exclude or otherwise alter common law, unless the common law is expressly displaced by URLTA provisions. See § 76-1403. "[S]tatutes which effect a change in the common law or take away a common law right should be strictly construed . . . ." *Paulsen v. Courtney*, 202 Neb. 791, 794, 277 N.W.2d 233, 235 (1979).

Nothing in the language of URLTA, generally or specifically, compels the conclusion that the Legislature intended that URLTA abrogate or displace common law concerning abandonment of real estate leased for residential purposes. Construing § 76-1432(3), we conclude that the 30-day abandonment provision benefits the landlord as well as the tenant regarding the landlord's recovery of leased premises without legal process in the event of a tenant's absence for the specified period. Without notice to the landlord, a tenant's absence from the premises for one full rental period or 30 days, whichever is less, constitutes abandonment of the premises under § 76-1432(3). However, a tenant may also abandon premises under common-law principles, entitling and obligating a landlord to take immediate possession of the premises and make reasonable efforts to obtain another tenant for the premises at a fair rental. Thus, under § 76-1432(3), abandonment affords qualified protection to a landlord against

a tenant's claim for wrongful ouster and provides the tenant with a defense that the landlord failed to mitigate damages after the tenant's abandonment of the leased premises. In the absence of a tenant's explicit abandonment of residential premises, legitimation of a landlord's self-help recovery of the leased premises during the first 30 days of the tenant's absence may depend on unequivocal but circumstantial proof of the tenant's abandonment. See, *Smith v. Favilla*, 23 Wash. App. 59, 593 P.2d 564 (1979); 51C C.J.S. *Landlord and Tenant* § 126(b) (1968).

## COMMON-LAW ABANDONMENT

"An abandonment of leased premises by the tenant constitutes an offer to terminate the lease, and an abandonment or surrender of the leased premises, together with an acceptance by the landlord . . . may constitute a surrender by operation of law." 51C C. J. S., Landlord and Tenant, § 125(1), p. 398. ". . . whether there has been an acceptance by the landlord of the tenant's abandonment of the premises is largely a matter of intention, and such an acceptance may be inferred from the acts of the landlord inconsistent with the continuance of the lease." 51C C. J. S., Landlord and Tenant, § 125(4), p. 402.

*Waite Lumber Co., Inc. v. Masid Bros., Inc.*, 189 Neb. 10, 21, 200 N.W.2d 119, 126 (1972).

While acceptance of a tenant's abandonment was an issue in *Waite Lumber, supra*, crucial in the present case are, first, whether Mason abandoned the premises and, second, whether Schumachers accepted Mason's abandonment. Before enactment of URLTA, a landlord's self-help repossession of leased premises which the landlord believed to be abandoned, was considered under a rule of "good faith" by the landlord.

"Where the tenant has actually abandoned the premises, the landlord is entitled to reenter and take charge and possession; and, even where he acts too hastily, but in good faith and under circumstances justifying a belief that the premises have been abandoned, he is guilty only of a technical violation of the tenant's contractual rights under the lease."

*Mathiesen v. Bloomfield*, 184 Neb. 873, 875, 173 N.W.2d 29, 30 (1969); *Langemeier, Inc. v. Pendgraft*, 178 Neb. 250, 132 N.W.2d 880 (1965). In *Mathiesen* and *Langemeier*, however, the court found an actual abandonment by the tenant and therefore did not apply the "good faith" rule to the landlord's repossession of the premises. With the enactment of URLTA, the continued vitality of *Mathiesen* and *Langemeier* may be questionable inasmuch as URLTA affords no protection to a landlord for a "good faith" ouster of a tenant.

Abandonment of leased premises occurs when a tenant, with the intention to terminate contractual rights to exclusive possession and control over leased premises, voluntarily relinquishes or vacates the leased premises. See, *Davis v. Odell*, 240 Kan. 261, 729 P.2d 1117 (1986); *Clark v. Morris*, 710 P.2d 1130 (Colo. App. 1985); *Smith v. Hegg*, 88 S.D. 29, 214 N.W.2d 789 (1974).

A tenant's intention to terminate the leasehold and abandon the premises may be circumstantially evidenced by conduct inconsistent with continued control over the leased premises. In determining whether a tenant had abandoned the leased dwelling unit or residence, the Supreme Court of Kansas, in *Davis v. Odell, supra*, construed the Residential Landlord and Tenant Act of Kansas, which did not contain a provision similar to § 76-1432(3) pertaining to abandonment resulting from a tenant's absence from the premises for a specified time. The court in *Davis* approvingly quoted from *Botkin v. Kickapoo, Inc.*, 211 Kan. 107, 505 P.2d 749 (1973), which was decided under common-law principles before the enactment of the Kansas landlord-tenant act:

> "Generally, abandonment is the act of intentionally relinquishing a known right absolutely and without reference to any particular person or for any particular purpose. Abandoned property is that to which the owner has voluntarily relinquished all right, title, claim and possession, with the intention of terminating his ownership, but without vesting it in any other person and with the intention of not reclaiming future possession or resuming its ownership, possession or enjoyment. In order to establish an abandonment of property, actual

relinquishment accompanied by intention to abandon must be shown. The primary elements are the intention to abandon and the external act by which that intention is carried into effect. Although an abandonment may arise from a single act or from a series of acts the intent to abandon and the act of abandonment must conjoin and operate together, or in the very nature of things there can be no abandonment. The intention to abandon is considered the first and paramount inquiry, and actual intent to abandon must be shown; it is not enough that the owner's acts give reasonable cause to others to believe that the property has been abandoned. Mere relinquishment of the possession of a thing is not an abandonment in a legal sense, for such an act is not wholly inconsistent with the idea of continuing ownership; the act of abandonment must be an overt act or some failure to act which carries the implication that the owner neither claims nor retains any interest in the subject matter of the abandonment. It is not necessary to prove intention to abandon by express declarations or by other direct evidence; intent to abandon property or rights in property is to be determined from all the surrounding facts and circumstances. It may be inferred from the acts and conduct of the owner and from the nature and situation of the property. Mere nonuse of property, lapse of time without claiming or using property, or the temporary absence of the owner, unaccompanied by any other evidence showing intention, generally, are [sic] not enough to constitute an abandonment. However, such facts are competent evidence of an intent to abandon and as such are entitled to weight when considered with other circumstances. . . ."

*Davis v. Odell, supra* at 269, 729 P.2d at 1124.

Although there was evidence that Mason had left some of his personal property at the duplex in May, the last period for which Mason paid rent was April. The situation involving Mason's personal property existed contemporaneously with Mason's acquisition of another residence apart from the duplex. Notwithstanding that the articles which Mason left at the duplex had some value, Mason's leaving those items at the

duplex, while he lived in another residence, may be viewed by a fact finder as evidence of Mason's intent to cease using the duplex as a residence. Postal service for Mason at the duplex was supposed to be discontinued on May 4. In that setting, one might conclude that Mason had removed enough property from the leased premises so that the duplex no longer served as a dwelling but was nothing more than a storage facility, contrary to the explicit mandate of § 76-1424: "Unless otherwise agreed, the tenant shall occupy his dwelling unit only as a dwelling unit." Whether we would arrive at the same conclusion reached by the county court regarding the issue of abandonment, were this appeal a trial de novo on the record, is irrelevant. From our review of the record for error, we cannot conclude that the county court's finding, namely, that Mason had abandoned the leased premises, is clearly erroneous. For that reason, we reverse the district court's judgment, which reversed the county court's judgment on the issue of abandonment, and remand this matter to the district court with direction to affirm the county court's judgment in favor of Schumachers in Mason's action for unlawful ouster from the duplex.

## SECURITY DEPOSIT

Under § 76-1416(3), if a landlord fails to comply with a tenant's proper demand for return of a security deposit, the tenant may recover the amount of the deposit and a reasonable attorney fee. The party claiming damages must show entitlement to the damages. See *Nebraska Truck Serv. v. U.S. Fire Ins. Co.*, 213 Neb. 755, 331 N.W.2d 266 (1983). Mason is not entitled to a judgment for his security deposit, since the evidence failed to establish that Schumachers did not comply with Mason's request for return of the security deposit. Hence, the district court's judgment, awarding Mason judgment for the security deposit on the duplex, is reversed, and the district court is directed to affirm the county court's judgment, which disallowed Mason's recovery of the security deposit on the duplex.

## CLEANUP COSTS AND DELINQUENT RENT

Schumachers cross-claimed for cleanup costs in the amount of $248, and for one month's delinquent rent of $395. However, Schumachers' proof established expenses of $175.45 only. A

tenant is obligated to return the premises to the landlord "in as clean condition, excepting ordinary wear and tear, as when the tenancy commenced." § 76-1421(2). Because Mason abandoned the premises, Schumachers were entitled and obligated to enter the duplex and make reasonable efforts to lease the duplex to another tenant at a fair rental. On termination of the rental agreement, the landlord may recover from the tenant actual damages for breach of the rental agreement plus past due rent, and may also be entitled to an attorney fee. See §§ 76-1435 and 76-1431(3). Schumachers are entitled to reimbursement for their expenses incurred in removing Mason's belongings from the duplex, because removal of the items was necessary for Schumachers' fulfillment of their statutory duty concerning an effort to relet the duplex to another tenant. See § 76-1432(3). We conclude that Schumachers did not prove $248 in damages, but proved damages of $175.45 for cleanup costs and proved entitlement to the rental of $395 for the month of May 1986. Therefore, as modified regarding the amount of the recoverable cleanup costs, namely, $175.45, the district court's judgments for Schumachers concerning the cleanup costs and Mason's delinquent rent for May 1986 are affirmed without allowance of an attorney fee.

## CONVERSION

As we have already noted, the Nebraska Legislature has significantly altered the national version of the Uniform Residential Landlord and Tenant Act, but has not codified the legal rights and corresponding obligations pertaining to a tenant's personal property remaining on the landlord's residential premises previously rented by the tenant. A very cursory review of the Uniform Residential Landlord and Tenant Act throughout the nation reveals at least eight states have statutorily clarified the various landlord-tenant rights regarding property remaining on residential premises abandoned or surrendered by the tenant and have prescribed a procedure concerning custody or retention and disposition of the tenant's personal property. See, Alaska Stat. § 34.03.260 (1985); Cal. Civ. Code §§ 1983 et seq. (West 1985); Fla. Stat. Ann. §§ 715.10 et seq. (West 1988); Kan. Stat. Ann.

§ 58-2565(d) (1983); Minn. Stat. Ann. § 504.24 (West Supp. 1989); Nev. Rev. Stat. § 118A.460 (1987); Okla. Stat. Ann. tit. 41, § 130 (West 1986); Va. Code Ann. § 55-248.38:1 (1986). In the absence of a statute concerning disposition of a tenant's personal property left on residential premises previously leased, the respective rights of landlord and tenant are determined by the common law governing the tort of conversion. See § 76-1403.

Conversion is the unauthorized and wrongful dominion over personal property owned by another, which is exerted as a denial of or inconsistent with the owner's rights in the property or is asserted in derogation, exclusion, or defiance of another's ownership or title in personal property. See, *Cattle Nat. Bank v. York State Bank*, 229 Neb. 720, 428 N.W.2d 624 (1988); *Roth v. Farmers Mut. Ins. Co.*, 220 Neb. 612, 371 N.W.2d 289 (1985); *PWA Farms v. North Platte State Bank*, 220 Neb. 516, 371 N.W.2d 102 (1985); 18 Am. Jur. 2d *Conversion* § 1 (1985). "The 'tort of conversion has been confined to those major interferences with the chattel, or with the plaintiff's rights in it, which are so serious, and so important, as to justify the forced judicial sale to the defendant which is the distinguishing feature of the action.' " *Polley v. Shoemaker*, 201 Neb. 91, 95, 266 N.W.2d 222, 225 (1978) (quoting W. Prosser, Handbook of the Law of Torts, *Conversion* § 15 (4th ed. 1971)).

When a landlord completely dispossesses a tenant of leased premises and either denies the tenant access to the tenant's personal property or asserts an interest in the tenant's property, an action for conversion will lie. *Polley v. Shoemaker, supra.* See, also, § 76-1434 (landlord's lien on household goods is not enforceable, and distraint for rent is abolished).

By the unauthorized taking of Mason's property to the landfill or dump, Schumachers undeniably exerted dominion over Mason's property, contrary to Mason's property rights. The defense of abandonment, asserted by Schumachers in response to Mason's conversion claim, is less plausible than the abandonment defense asserted in Mason's URLTA action because, unlike their landlord's interest in the leased real estate, Schumachers had no reversionary interest or right to eventual possession of Mason's personal property. See *Glass v. Wiener*,

104 A.D.2d 967, 968, 480 N.Y.S.2d 760, 761 (1984): "A landlord has no absolute right to retain or destroy personal property belonging to a tenant. Even where a tenant is legally dispossessed, the landlord's rights extend only to the real property. He acquires no concomitant right to use or retain the tenant's personal property." See, also, *Price v. Hoyle*, 82 Misc. 2d 174, 368 N.Y.S.2d 126, 129 (1975): "Whether the plaintiff [tenant] abandoned the premises or was locked out, the defendants [landlords] have no right whatever to the plaintiff's personal property." See, further, *Hopkin v. Goetz*, 132 Vt. 581, 326 A.2d 12 (1974).

Robert Schumacher testified that he considered Mason's items left behind to be "trash," but apparently believed Mason's belongings had sufficient value to warrant attempts to contact Mason during the 3 days in which Schumachers prepared to remove Mason's belongings from the duplex. Furthermore, as noted in *Stankiewicz v. Hawkes*, 33 Conn. Supp. 732, 734, 369 A.2d 253, 254 (1976):

> The numerous personal belongings which she [the tenant] left behind, items such as winter clothing, sheets, blankets and pillow cases, bureaus, a table and chairs, bespeak an expectation of early return and not of permanent removal. The plaintiff's property rights are not measured by the state of her finances. However humble her possessions, they were hers to use. The fact that the defendant [landlord] considered those possessions rags and junk gave him no right to exercise dominion over them. The removal of the plaintiff's property from the apartment and its exposure to the elements, under the circumstances of this case, constituted a conversion.

We therefore conclude that the evidence was insufficient to support the county court's determination that Mason's personal property had been abandoned. Mason is entitled to maintain his action for Schumachers' unlawful conversion of his personal property. The district court's judgment, reversing the county court's clearly erroneous decision in dismissing Mason's conversion petition, is affirmed with direction that the cause be remanded to the county court for a new trial on Mason's conversion action. In view of the trial court's

characterization of Mason's property as "trash," retrial before another fact finder is a consideration.

AFFIRMED IN PART, AFFIRMED IN PART
AS MODIFIED, AND IN PART REVERSED
AND REMANDED WITH DIRECTION.

FAHRNBRUCH, J., not participating.