KEARNEY STATE BANK AND TRUST COMPANY, A NEBRASKA BANKING CORPORATION, APPELLEE, v. RUSSELL SCHEER-WILLIAMS AND SCHEER-WILLIAMS CLOTHIER, INC., APPELLANTS.

428 N.W.2d 888

Filed September 9, 1988.   No. 86-783.

Kenneth F. George, of State, Yeagley & George, for appellants.

Thomas W. Tye, of Tye, Hopkins & Associates, for appellee.

HASTINGS, C.J., CAPORALE, GRANT, and FAHRNBRUCH, JJ., and JOHN MURPHY, D.J.

HASTINGS, C.J.

This is an appeal from a jury verdict in a contract action from the district court for Buffalo County. The jury found for the plaintiff-appellee, Kearney State Bank and Trust Company (Bank), in the amount of $10,000. The parties defendant to this action, Russell Scheer-Williams and the men's clothing store of which he is the owner and operator, Scheer-Williams Clothier, Inc., bring this appeal.

On January 15, 1985, the Bank took a security interest in the store's inventory, accounts, fixtures, etc., based on a prior security agreement and financing statement (dated October 4, 1982) in exchange for a 30-day promissory note in the amount of $230,857.17. On February 14, 1985, the note was in default.

The Bank had loaned money to the defendants in the past. The defendants usually dealt with the Bank's president, Larry Wangrud. On February 19, 1985, a 90-day renewal note was given to Wangrud. The renewal was not approved by the loan committee of the Bank.

On March 1, 1985, the Bank filed a separate action in replevin to secure the collateral under the first note. On March 11, 1985, a meeting of the parties took place in which a new "Agreement" was negotiated.

On March 28, 1985, the parties entered into a written "Agreement" whereby the defendant debtors voluntarily surrendered possession of all collateral to the creditor Bank, and the Bank agreed to sell the same in a commercially reasonable manner and apply the proceeds to the indebtedness owing by the defendants.

The agreement also forgave $15,000 of indebtedness owing on a personal guaranty from the wife of defendant Russell Scheer-Williams. In the agreement it was acknowledged that the Bank was to sell the collateral by public or private sale or by liquidation sale, and the defendants waived any and all rights to notification of the sale of the collateral. The agreement further provided that if the net proceeds of the sale did not bring $140,000, the defendants consented that a judgment might be entered against them for the difference, or $15,000, whichever was less. If the proceeds exceeded $140,000, the indebtedness would be satisfied.

The Bank did not give specific notice of the sale. It hired professional liquidators to conduct the sale. The liquidators were in the store, together with Russell Scheer-Williams, taking inventory in preparation for the sale on March 26 and 27, 2 days before the agreement was signed. Such was the testimony of Russell Scheer-Williams.

The sale was conducted from March 30 to May 11, 1985, after the Bank took possession of the collateral, but resulted in a deficient amount of proceeds. A going-out-of-business sale was utilized to dispose of inventory, and all remaining collateral was sold at various times at private sale.

The Bank filed suit and sought recovery in the amount of $15,000 under the agreement. The defendants contended that the essence of the Bank's cause of action was for a deficiency judgment and that it is precluded from such judgment as no notice of disposition was given as required under Neb. U.C.C. § 9-504(3) (Reissue 1980). At the close of the plaintiff's case in chief, the defendants made a motion for a directed verdict or to

dismiss on this basis. The trial judge ruled as a matter of law that the Uniform Commercial Code provisions did not apply, and failed to instruct the jury on the matter of notice. He treated the agreement as an accord. The jury allowed recovery under the agreement in the amount of $10,000.

The appellants challenge the trial court's ruling, as a matter of law, that the U.C.C. did not apply in this case. In so doing, the appellants are in essence challenging the trial court's overruling of its motion to dismiss at the close of all the evidence.

With regard to the overruling of a motion for a directed verdict made at the close of all the evidence, our review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can only draw but one conclusion from the evidence, where an issue should be decided as a matter of law. *Prime Inc. v. Younglove Constr. Co.*, 227 Neb. 423, 418 N.W.2d 539 (1988).

Regarding questions of law, this court has an obligation to reach conclusions independent of those reached by the trial court. *Communications Workers of America v. Abrahamson*, 228 Neb. 335, 422 N.W.2d 547 (1988).

The appellants are also critical of the court's failure to give a U.C.C. instruction. It is the trial court's duty to instruct the jury on the issues presented by the pleadings and supported by the evidence. If the instructions taken as a whole correctly state the law, are not misleading, and adequately cover the issues, there is no prejudicial error upon which a reversal on appeal may be based. *Gilbert v. Archbishop Bergan Mercy Hospital*, 228 Neb. 148, 421 N.W.2d 760 (1988).

With regard to the last assignment of error, on the sufficiency of the evidence to sustain the jury's verdict, we have stated many times that a jury verdict will not be disturbed on appeal unless it is clearly wrong. *Associated Wrecking v. Wiekhorst Bros.*, 228 Neb. 764, 424 N.W.2d 343 (1988).

The bargain of the parties in fact is found in the language of their agreement. The agreement is set out in part at paragraph No. 2:

> Scheer-Williams Clothier and Russell Scheer-Williams *immediately release possession* of all machinery,

equipment, furniture, fixtures, inventory, accounts, and other personal property, and all proceeds therefrom, which are secured by the bank for payment of the above mentioned notes, to the bank. Scheer-Williams Clothier and Russell Scheer-Williams further recognize that the bank intends to sell said property and to apply the proceeds therefrom, after reasonable costs and expenses, to the above mentioned notes, and Scheer-Williams Clothier and Russell Scheer-Williams *renounce and waive any and all rights to notification of said sale*, all rights to redeem the collateral, and release any and all interests they have in the collateral. Upon the execution of this Agreement, Russell Scheer-Williams shall deliver to the bank the keys to the premises of the clothing store formerly known as Russell's in which the collateral is located, and such delivery of said keys shall constitute a delivery and release of possession of the collateral to the bank.

(Emphasis supplied.)

The parties have clearly chosen to remove themselves from the protections of the code. This practice is authorized by the code itself at Neb. U.C.C. § 9-501 (Reissue 1980) and § 9-504.

Section 9-501 provides as follows:

(1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this Part and except as limited by subsection (3) those provided in the security agreement. . . .

. . . .

(3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to below may not be waived or varied except as provided with respect to compulsory disposition of collateral (subsection (3) of section 9-504 and section 9-505) and with respect to redemption of collateral (section 9-506) but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable;

. . . .

(b) subsection (3) of section 9-504 and subsection (1) of section 9-505 which deal with disposition of collateral . . . .
Section 9-504(3) provides:

Disposition of the collateral may be by public or private proceedings . . . . [R]easonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made will be sent by the secured party to the debtor, *if he has not signed after default a statement renouncing or modifying his right to notification of sale.*

(Emphasis supplied.) More generally, Neb. U.C.C. § 1-102 (Reissue 1980) directs courts to construe and apply the U.C.C. liberally to promote its underlying purposes and policies. Section 1-102 in part provides:

(1) This act shall be liberally construed and applied to promote its underlying purposes and policies.

(2) Underlying purposes and policies of this act are

(a) to simplify, clarify and modernize the law governing commercial transactions;

(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions.

(3) The effect of provisions of this act may be varied by agreement, except as otherwise provided in this act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this act may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

The agreement forgave a great amount of indebtedness, released a personal guaranty, and limited the amount of a deficiency judgment to $15,000, or $140,000 less the net proceeds, whichever was the smaller figure. Considering the benefits received, it does not appear that the waiver of notice of the impending sale was manifestly unreasonable. The agreement itself states that "the parties are desirous of settling

and resolving all disputes between them without further litigation." The agreement contains a conspicuous waiver of notice and specifically provides for the sale as the Bank's intention as soon as possession and inventory are caused to be made.

When the code does not apply, principles of contract law and estoppel are appropriate.

> Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principle [sic] and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

Neb. U.C.C. § 1-103 (Reissue 1980).

A bill or note may be waived by subsequent agreement. 10 C.J.S. *Bills and Notes* § 264 (1938). Here, by an express agreement, the parties declared maturity of the note. The waiver of notice provision is valid and should be construed as any other contract. It is unambiguous and should be enforced. Giving the words of the contract their plain and ordinary meaning as ordinary, average, or reasonable persons would understand them, it is clear that the parties and the language used contemplated an immediate liquidation sale without the requirement of notice to the debtors. In exchange, the requirement of the amount of the debt was fixed, a substantial amount was dismissed, and a guaranty was released.

In this instance, an agreement was reached wherein the debtors released possession of the collateral, in essence to tender, in full satisfaction of the claim, an amount of $140,000 from sale proceeds. The creditor bank accepted the tender subject to certain conditions. The condition that $15,000 would be the maximum amount of liability should the proceeds be deficient was declared. Further, it was stipulated in the agreement that should the net proceeds be $140,000 or more, the debtors would "be fully and completely discharged and released from any and all liability for the payment of the balance of the indebtedness owed on the notes to the bank."

The district court held that an accord and satisfaction had

occurred; i.e., that there was a bona fide dispute between the parties, that the substituted performance was tendered in full satisfaction of the claim, and that the tendered performance was accepted. *Rees v. Huffman*, 222 Neb. 493, 384 N.W.2d 631 (1986). The facts support such a holding.

Additionally, the record fully supports the conclusion that in this instance, the existing liability of the defendants to the Bank was completely extinguished and a new one substituted in its place according to the terms of the written agreement. This clearly constitutes a novation. *Chadron Energy Corp. v. First Nat. Bank*, 221 Neb. 590, 379 N.W.2d 742 (1986).

Having determined that a waiver of notice was authorized under the code in view of the circumstances of this case, whether we decide this case on that basis, or on the basis of accord and satisfaction or novation, the trial court was correct in ruling that the failure of formal written notice was not fatal to the Bank's cause of action.

The amount sought in the petition, $15,000, was based not on the amount of indebtedness in the note but on the terms of the contract. The petition is couched in terms of the contract and is not intended as seeking a deficiency judgment. Whether the note itself technically was not yet in default, the parties nevertheless contracted to allow an acceleration of the indebtedness of the debtors, causing the note to mature.

Under the agreement, the Bank was obliged to sell the collateral in a commercially reasonable manner. The agreement provides in relevant part:

> The bank agrees to sell the collateral in a commercially reasonable manner by public or private sale, or by liquidation sale, and to exercise reasonable efforts to obtain the highest or best return on the collateral under the conditions and circumstances of such liquidation. The bank agrees to pay all costs and expenses incurred in connection with the occupancy of the premises and in conducting the sale of the collateral, including, but not necessarily limited to, the cost of promotional goods, additional inventory, rent, utilities, advertising, wages, taxes and the like. After deducting all such costs and expenses from the proceeds received by the sale of the

collateral and the sale of any goods purchased by the bank as a means of promoting the sale of the collateral, the net proceeds shall be applied in reduction of the indebtedness owed to the bank as alleged in the Recitals above.

The defendants challenge the way in which the liquidation took place—alleging that the Bank did not proceed in a commercially reasonable manner because promotional goods were not utilized. The sale was primarily a sale of winter clothing, and it was urged that a spring line of clothing (promotional goods) would assist in advancing the winter line as the sale occurred in the spring months. It lasted from March 30 to May 11, 1985. The above agreement mentions promotional goods but certainly does not mandate use of them.

Russell Scheer-Williams also objected to the rate at which a percentage of discount was taken on the inventory. He felt that the sale progressed too quickly. With regard to the rate of markdowns, the fact that the merchandise may have yielded a higher price had alternate methods been employed does not show unreasonableness. Neb. U.C.C. § 9-507(2) (Reissue 1980) in part provides:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition.

The proceeds from sales of fixtures totaled $4,308.42. The proceeds from the inventory sales were $152,085.70. Before the sale began, an inventory of the store resulted in a retail figure of at least $210,000 in the opinion of Frank Newman, a businessman involved in menswear, who had conducted over half a dozen going-out-of-business sales. With expenses of

approximately $30,000, net proceeds of $180,000 should have resulted.

Newman explained the generally accepted procedure in conducting a going-out-of-business sale. He stated that a consultant (liquidator) is almost never given a flat fee for his services but, rather, is hired on a commission basis, a certain percentage of the gross volume of the store. This provides the consultant with an incentive to increase sales and make effective markdowns. The professional liquidators hired by the Bank were given a flat fee of $15,000.

Newman continued that it is an unacceptable practice for the consultant to run the cash register. The store owner usually handles the cash register. In this case, the liquidators ran the cash registers, but one or two of the Bank officers were in the store nearly every day.

According to Newman, a store should not be closed on Sundays during a liquidation sale. There was evidence that the liquidators closed Russell's clothing store on occasional Wednesdays and Sundays. Further, Newman testified that no refunds or exchanges are acceptable or common practice in a going-out-of-business sale. Although the liquidators had a "no refund" policy, refunds and exchanges were in fact made. The sale was advertised in the Kearney Daily Hub on March 29, 1985, to provide notice to the public sufficiently in advance, and throughout the sale. It was published in a reasonable manner calculated to assure publicity for the collateral to be sold at the best possible price. It also appears that there was some advertising on television and radio as well.

Expenses incurred totaled $38,606.66. The reasonableness of the expenses when collateral is sold is relevant in determining whether the sale was commercially reasonable. *First Nat. Bank of Omaha v. Kizzier*, 202 Neb. 369, 275 N.W.2d 600 (1979).

The U.C.C. also requires the creditor to proceed in a commercially reasonable manner to liquidate accounts receivable, as the security agreement specifically encompassed accounts. *DeLay First Nat. Bank & Trust Co. v. Jacobson Appliance Co.*, 196 Neb. 398, 243 N.W.2d 745 (1976); Neb. U.C.C. § 9-502(2) (Reissue 1980). The evidence regarding accounts receivable was in conflict. Joe Novak, a loan officer

with the Bank, testified that he had not found any letters or memorandums regarding accounts receivable. Russell Scheer-Williams testified that he had given all of the accounts receivable to the liquidators for collection, but some had not yet been collected.

The issue of commercial reasonableness was submitted to the jury as to whether the Bank had shown by a preponderance of the evidence that it substantially performed the terms of the agreement, and the jury found in favor of the Bank. We cannot say that the jury's inherent determinations that the collateral was sold in a commercially reasonable manner and that the damages sustained amounted to $10,000 were clearly wrong. There was sufficient evidence to support the jury's verdict.

The Bank's claim was founded on the agreement, and the trial court did not incorrectly rule on it as a contract in itself. The jury instructions were proper, and the verdict that the Bank substantially performed the terms of the agreement was not clearly wrong. The judgment of the trial court is affirmed.

AFFIRMED.