CHADRON ENERGY CORPORATION, A NEBRASKA CORPORATION, APPELLEE, V. FIRST NATIONAL BANK OF OMAHA, A NATIONAL BANK, APPELLANT.

459 N.W.2d 718

Filed August 31, 1990.    No. 88-095.

James B. Cavanagh, of Erickson & Sederstrom, P.C., for appellant.

M.J. Bruckner, of Bruckner, O'Gara, Keating, Sievers & Hendry, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

This is the second appearance of this case in this court. Our former opinion may be found in *Chadron Energy Corp. v. First Nat. Bank*, 221 Neb. 590, 379 N.W.2d 742 (1986) *(CEC I)*. As a result of that opinion, the cause was remanded to the district court for trial on two general issues: (1) whether the sale of secured stock by the defendant here was conducted in a commercially reasonable manner and, if not, the damages, if any, sustained by Chadron Energy Corporation (CEC), and (2) a redetermination of the damages for conversion sustained by Gordon C. Shaffer, Jr., Marian Shaffer, and Leslie Kleman, to be computed as of October 1982 rather than November 1980. Before the new second trial, the Shaffers and Kleman settled their claims against the First National Bank of Omaha (FNBO) and are no longer parties to this litigation.

At the trial out of which this appeal arises, the jury found that FNBO failed to conduct a commercially reasonable foreclosure sale and that the reasonable value of the stock had the sale been commercially reasonable would have been $2,353,200, rather than the $1,410,000 which the sale actually brought. Following that verdict, the district court determined

that FNBO had no claim to certain interpleaded funds.

This litigation is based on a series of involved and somewhat complicated transactions.

In March 1979, the First National Bank of Chadron (FNB-Chadron) was a national banking corporation which had issued and outstanding 2,000 shares of capital stock. On March 6, 1979, six individuals represented by George Wulf (Wulf Group) entered into a stock purchase agreement for 1,990 shares of FNB-Chadron stock. The sale price was $5 million, part of which was to be paid in cash at the time of the closing and the balance of which was to be represented by notes from the individual members of the Wulf Group. Of the 1,990 shares of stock to be purchased, 1,815 would be purchased from the Shaffers and Kleman. In order to obtain the necessary cash to make the downpayment to the Shaffers and Kleman, the Wulf Group borrowed $2.1 million from FNBO. The Shaffers received $860,000 in cash plus notes totaling $2,102,500, and Kleman received $1,180,000 in cash plus notes totaling $395,000.

Both the loan from FNBO and the notes to the Shaffers and Kleman were secured by 1,850 shares of FNB-Chadron stock. (The discrepancy between the number of shares purchased from the Shaffers and Kleman and the number of shares securing the debts to FNBO, the Shaffers, and Kleman is unexplained in the record.) By agreement among all parties, FNBO was designated as the senior lienholder at that time and the Shaffers and Kleman as junior lienholders.

FNBO took physical control of six individual stock certificates, each issued in the name of one of the six members of the Wulf Group. FNBO assured the Shaffers and Kleman in writing that "[w]e will not release such collateral from our possession until you have notified us that your security interest has been released or discharged."

Later in 1979, the Wulf Group formed a corporation under the name of First of Chadron Bank Corporation, and received approval of the Federal Reserve Bank of Kansas City to become a one-bank holding company and to acquire the capital stock of FNB-Chadron. The holding company's name was later changed to Chadron Energy Corporation.

Beginning in March 1980, it was necessary for the Wulf Group to secure various extensions on the loans and notes from FNBO and the Shaffers and Kleman. Finally, a public offering of CEC stock was conducted during the summer of 1980. The purpose of the offering was to secure sufficient funds to allow CEC to purchase the FNB-Chadron stock from the Wulf Group. The members of the Wulf Group would then pay off their debts to FNBO and the Shaffers and Kleman and would recover the FNB-Chadron stock being held as collateral.

The public offering was not completely successful, although there was approximately $1.6 million in proceeds which were used to pay down the debts of the Wulf Group to FNBO. Other financing was obtained in order to complete the sale of the FNB-Chadron stock from the Wulf Group to CEC.

The Wulf Group then sought to have CEC assume their loans with FNBO by having FNBO rewrite them in CEC's name in the amount of $600,000 and then discharge the individual debts of the Wulf Group. FNBO, although agreeable to this arrangement, insisted that both the Shaffers and Kleman would have to consent to the transference of the stock from the names of the six individuals in the Wulf Group to CEC before the transaction could be completed. Under this plan, once all of this was accomplished, a single stock certificate in the name of CEC would be returned to FNBO, which would continue to hold the certificate in its possession as security for its loan and the debts owed to the Shaffers and Kleman.

The Shaffers and Kleman refused to sign the consent forms. Despite this lack of consent and although an assumption agreement was never executed by CEC to FNBO, nevertheless FNBO accepted a new note from CEC, delivered the six stock certificates to the individuals in the Wulf Group, permitted the stock to be reregistered in a single certificate in the name of CEC, and accepted back the new stock certificate. "The notes from the six members of the Wulf Group [to FNBO] were, in effect, marked 'paid' and returned to them." *CEC I, supra* at 602, 379 N.W.2d at 750.

As the result of pay downs and additional borrowing, the amount owed by CEC to FNBO varied over time. On March 29, 1982, CEC's note was renewed in the amount of $666,000.

Because of various difficulties experienced throughout 1982, CEC was unable to make the September 27, 1982, payment due on the March 29 note held by FNBO.

FNBO notified CEC that it was in default on the note for nonpayment in the total amount of $720,767.10 principal and accrued interest and that the collateral (stock) would be sold on October 28, 1982. In a notice dated October 18, 1982, FNBO notified CEC that the sale would occur on October 29, 1982. FNBO then sent notice of the sale to approximately 110 people.

Prior to the sale, FNB-Chadron, CEC, and the Shaffers filed a petition to restrain the sale. Although a temporary restraining order was granted on October 28, 1982, the required bond was never posted and FNBO proceeded with the sale.

Only three people participated in the bidding during the October 29, 1982, auction/sale of the 1,850 shares of FNB-Chadron stock. The highest bid obtained during the public bidding was $1,450,000. However, a representative of FNBO held private discussions with each of the three bidders as to the amount each was willing to pay down as a nonrefundable deposit on his bid. As a result of those discussions, the second highest bidder agreed to put down $500,000, as compared to $10,000 by the highest bidder. Therefore, FNBO declared the bid of the second highest bidder to be the highest and best bid and accepted $1,410,000 for the stock.

On October 29, 1982, the $500,000 downpayment was applied to CEC's debt to FNBO, and when the balance of $910,000 was paid on December 10, 1982, FNBO took out its claimed expenses of the sale and the remaining principal and interest owed by CEC.

After the sale, FNB-Chadron dismissed itself from the pending lawsuit, and CEC and the Shaffers proceeded against FNBO for damages, CEC maintaining that the stock was not sold in a commercially reasonable manner and the Shaffers maintaining that stock in which they had a security interest had been converted by FNBO. Several weeks later, Kleman first learned that the stock in which he claimed a security interest had been sold, and he joined the Shaffers in seeking damages for conversion. Before trial, FNBO filed a "counterclaim (interpleader)," interpleading the balance of $661,154.99

remaining from the proceeds of the sale. In an order entered March 8, 1983, the district court stated that FNBO impleaded $654,154.99, which the parties jointly agreed to invest during the pendency of the action, subject to the control and jurisdiction of the court as an interpleaded fund. (The balance remaining after principal, accrued interest, and FNBO's claimed expenses are deducted from the proceeds is $654,154.99, not $661,154.99.)

In *CEC I*, the district court decided as a matter of law that the claim of CEC against FNBO was moot because the stock sold for more than CEC owed to FNBO and thus no deficiency was created. Regarding the claims of the Shaffers and Kleman, after trial the district court found that when FNBO returned the six individual certificates of stock to the individual members of the Wulf Group and permitted the certificates to be canceled and the stock transferred to the name of CEC, FNBO converted the stock of the Shaffers and Kleman. The district court entered judgment for damages for such conversion against FNBO in favor of the Shaffers and Kleman, basing the damages award on the value of the stock as of November 1980, the date of the tender of the six stock certificates and the acceptance of the reissued single certificate by FNBO.

On appeal this court reversed the judgment of the district court, declaring that (1) CEC's claim was not moot because

> [e]ven though the sale may produce a surplus, if in fact a sale in a commercially reasonable manner would have produced a larger surplus, the failure of the [creditor] to sell the security in a commercially reasonable manner has caused the debtor damages which the debtor has a right to recover in a proper action,

*CEC I, supra* at 599, 379 N.W.2d at 748, and that (2) the date of the conversion as to the Shaffers and Kleman was October 29, 1982, the date of the sale. The cause was remanded for a determination of the damages for conversion as of the date of the sale and to determine "whether the sale of the stock belonging to Chadron Energy was conducted in a commercially reasonable manner and, if not, what, if any, damages Chadron Energy sustained thereby." *Id.*

After the decision in *CEC I*, FNBO settled the claims of the

Shaffers and Kleman and received back assignments of their rights. Thereafter, FNBO, in the trial court, moved to dismiss its counterclaim (interpleader) and to have the interpleaded funds paid to it, claiming it was entitled to the funds by virtue of its assignments from the Shaffers and Kleman and by virtue of subrogation. The district court overruled these motions, but sustained the motion to strike the Shaffers and Kleman from the lawsuit on the grounds that their claims had been settled.

During the trial on remand, both sides presented witnesses who testified on the issue of commercial reasonableness of the sale. Perhaps of particular significance was evidence that FNBO had included in the notice of sale that the total equity capital of FNB-Chadron was $648,000, as opposed to testimony that FNBO knew, from an internal memo from its accountants, Touche Ross & Co., that there could be a tax refund of approximately $500,000 which would enhance the equity capital by that amount.

The jury decided that the sale was not commercially reasonable and that "[t]he fair and reasonable value of the [collateral] in its then condition at a commercially reasonable disposition and sale" was $2,353,200. After the $1,410,000 proceeds of the sale and the $4,500 the jury determined to be the reasonable amount of FNBO's expenses were subtracted out, the amount of CEC's damages was determined to be $938,700. Subsequent to the jury's verdict, the district court entered an order holding that FNBO had no claim to the interpleaded funds and ordered the funds distributed to CEC.

FNBO's 12 assignments of error may be consolidated and summarized as alleging: (1) The district court erred in failing to grant FNBO's motion for directed verdict; (2) the verdict of the jury is contrary to the facts and the law and is not supported by sufficient evidence; (3) the district court erred in giving certain jury instructions and in refusing to give certain jury instructions requested by FNBO; (4) the district court erred in finding that the Shaffers and Kleman had no security interest in the collateral and proceeds of the sale; in finding that, therefore, FNBO had no subrogation rights to and could not acquire any assignment of the interpleaded funds through its settlement with the Shaffers and Kleman; in failing to sustain

the motions of FNBO to dismiss the interpleader and release the moneys to FNBO; and in finding that CEC was entitled to the interpleaded funds; (5) the district court erred in excluding certain exhibits, in excluding testimony of CEC's attorney, in excluding evidence of CEC's suit against and recovery from former directors of CEC and FNB-Chadron, and in allowing testimony regarding a July 1982 agreement for the sale of the FNB-Chadron stock; and (6) the district court erred in finding that CEC was not estopped from asserting facts other than those relied upon by FNBO. Finding some merit in FNBO's fourth assignment of error and having determined that CEC's damages were calculated incorrectly, we reverse and remand for a new trial on the issue of damages only.

FNBO's complaints will be discussed in the order of the consolidated and summarized assignments of error.

## FNBO'S MOTION FOR DIRECTED VERDICT

In order to sustain a motion for a directed verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Ginn v. Lamp*, 234 Neb. 198, 450 N.W.2d 388 (1990). In considering the evidence for the purpose of a motion for directed verdict, the party against whom the motion is made is entitled to have the benefit of every inference which can reasonably be drawn from the evidence; if there is any evidence in favor of the party against whom the motion is made, the case may not be decided as a matter of law. *Id.*

As will be set out more fully in the discussion of the next assignment of error, the facts were not such that reasonable minds could draw but one conclusion, that is, that FNBO conducted a commercially reasonable sale. The district court, therefore, did not err in failing to grant FNBO's motion for a directed verdict.

## THE JURY'S VERDICT

As a general rule, in determining the sufficiency of the evidence to sustain a verdict in a civil case, this court considers the evidence most favorably to the successful party and resolves evidential conflicts in favor of such party, who is entitled to every reasonable inference deducible from the evidence. *Vanek*

*v. Prohaska*, 233 Neb. 848, 448 N.W.2d 573 (1989).

A civil jury verdict will not be disturbed on appeal unless clearly wrong. *Fisher Corp. v. Consolidated Freightways*, 230 Neb. 832, 434 N.W.2d 17 (1989). A verdict is not to be set aside where the evidence is in conflict or where reasonable minds may reach different conclusions or inferences, as it is within the jury's province to decide issues of fact. *Id.*

At issue is the commercial reasonableness of the sale. Under the Nebraska version of the Uniform Commercial Code, after default by the debtor a secured party may dispose of the collateral and apply the proceeds toward satisfaction of the indebtedness. See Neb. U.C.C. § 9-504(1) (Reissue 1980). Section 9-504(3) provides in part:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but *every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.*

(Emphasis supplied.)

We have previously referred to the dispute as to the total equity capital of FNB-Chadron and the failure of FNBO to disclose the possibility of a $500,000 tax refund. Suffice it to say that conflicting testimony presented a question of fact which was decided adversely to FNBO by the jury. The issue of whether a sale was commercially reasonable is a question of fact for the jury to decide. See *Kearney State Bank & Trust v. Scheer-Williams*, 229 Neb. 705, 428 N.W.2d 888 (1988). It is for the jury, as trier of the facts, to resolve conflicts in the evidence and to determine the weight and credibility to be given to the testimony of the witnesses. *Worth v. Schillereff*, 233 Neb. 628, 447 N.W.2d 480 (1989).

Having disposed of FNBO's challenge of the jury's determination that FNBO failed to conduct a commercially reasonable sale, we turn now to the jury's determination of CEC's damages.

The measure of damages sustained by CEC because the sale was not commercially reasonable is the *additional* surplus CEC

would have received if the sale had been conducted in a commercially reasonable manner. Additional surplus is the difference between the price actually received and the price that could have been obtained if the sale had been conducted in a commercially reasonable manner.

In instruction No. 26, if the jury found that the sale was not made in a commercially reasonable manner and that CEC was damaged by the sale, the jury was instructed to determine "[t]he fair and reasonable value of the 1,850 shares in The First National Bank of Chadron in its then condition at a commercially reasonable disposition and sale . . . ." The problem is not in how the jury was told to calculate CEC's damages, but in the evidence available to the jury with which it could calculate CEC's damages. Although the jury heard evidence that the Shaffers and Kleman also had liens against the FNB-Chadron stock, the district court excluded evidence of the amount of their liens and the fact that their liens had priority over the lien of FNBO.

In a commercially reasonable sale, the bidders would have been informed that the stock was being sold subject to first liens in the total amount of $1,903,408.61. Such information would of course affect the amount that could be realized in a commercially reasonable sale. Although it is possible that CEC suffered no damage due to FNBO's failure to conduct a commercially reasonable sale because a sale of the stock subject to the liens of the Shaffers and Kleman would not produce as much as was actually realized by the sale, this is for a jury, not this court, to decide.

Due to the exclusion of evidence regarding the liens of the Shaffers and Kleman, the $2,353,200 found by the jury to be the "fair and reasonable value" of the stock at a commercially reasonable sale cannot be accepted. In addition, the district court instructed the jury to determine the reasonable expenses of the sale and subtract that amount from the difference between "the fair and reasonable value" of the stock and what was actually realized. In so instructing the jury the district court erred because the effect was to give FNBO double credit for expenses, since FNBO deducted expenses from the proceeds of the sale before interpleading the surplus. If on retrial the jury

determines that the reasonable expenses of the sale were less than the amount FNBO deducted, the difference becomes part of the surplus and is to be added to the interpleaded funds which represent the surplus.

## JURY INSTRUCTIONS

FNBO assigns as error the giving of jury instructions Nos. 2, 15, 16, and 17. However, nowhere in the argument section of FNBO's brief is there a discussion of its complaints about those instructions. This court will not consider assignments of error which are not discussed in the brief. *State v. Broadstone*, 233 Neb. 595, 447 N.W.2d 30 (1989); *Federal Land Bank of Omaha v. Victor*, 232 Neb. 351, 440 N.W.2d 667 (1989).

FNBO assigns as error the refusal to give jury instructions Nos. 6, 6A, 7, 9, 10, 11, and 12 requested by FNBO. FNBO does not discuss requested instruction No. 7 in its brief, and that instruction will not be considered.

In order to establish as error the trial court's refusal to give a requested instruction, an appellant is under a threefold burden to show that he or she was prejudiced by the court's refusal, that the tendered instruction is a correct statement of the law, and that the instruction is applicable to the evidence in the case. *Rose v. City of Lincoln*, 234 Neb. 67, 449 N.W.2d 522 (1989); *Worth v. Schillereff*, 233 Neb. 628, 447 N.W.2d 480 (1989).

FNBO's proposed instruction No. 6 states, in effect, that CEC and FNBO had agreed in the promissory note evidencing the debt that 5 days' notice of any sale of the stock would be commercially reasonable notice, that FNBO had given CEC more than 5 days' notice, and that, as a matter of law, the notice given was commercially reasonable.

That instruction covers only part of FNBO's duty in this case. Section 9-504(3) gives the debtor the right to notice of the time and place of the public sale. Nowhere in the proposed instruction is it stated that the notice notified CEC of the time and place of the public sale. Furthermore, the complaint as to the unreasonableness of the sale did not go to the days of notice to CEC. The defect in the notice alleged, and CEC's evidence supported, the proposition that there was not sufficient notice to prospective bidders and that the facts contained in the notice

relating to the sale were not accurate.

Proposed instruction No. 6A states that to constitute a commercially reasonable sale the notice should be in written form and should be sent in such time that the debtor would have a minimum of 3 business days to arrange to protect his interests and that because the notice in this case was given more than 3 days prior to the sale, it was commercially reasonable as a matter of law.

The proposed instruction does not correctly state the law. This court has established the rule that a debtor must be given reasonable notice and that ordinarily a minimum of 3 business days is required. See, *First Nat. Bank of Bellevue v. Rose*, 197 Neb. 392, 249 N.W.2d 723 (1977); *DeLay First Nat. Bank & Trust Co. v. Jacobson Appliance Co.*, 196 Neb. 398, 243 N.W.2d 745 (1976). However, as stated by the court in *First Nat. Bank of Bellevue v. Rose, supra* at 397, 249 N.W.2d at 726, "the ordinary 3-day rule set forth in DeLay is a minimum requirement, and such notice is not necessarily sufficient in all cases." Therefore, the language in the proposed instruction that "[t]he notice which was given to Chadron Energy Corporation in this case was given more than three days prior to the sale, and was commercially reasonable as a matter of law" is clearly not a correct statement of the law.

FNBO's proposed instruction No. 9 attempts to define the rule relating to any damages to be awarded to CEC. After stating that the measure of damages is the amount of surplus, if any, that would have been obtained if the sale had been conducted in a commercially reasonable manner, it goes on to state:

> The surplus is defined as the amount of money that would have been available after the sale of the 1,850 shares of stock of First National Bank of Chadron after payment of all reasonable expenses of sale and payment of all liens held by First National Bank of Omaha, Gordon and Marian Shaffer, and Leslie Kleman against the stock, which liens were in the total amount of $2,631,586.43 on the date of the sale. Surplus is the amount by which the sale price at a commercially [reasonable] sale would have exceeded those liens and expenses.

This proposed instruction did not correctly state the law. As discussed previously, the measure of CEC's damages is additional surplus, not surplus. Furthermore, in this case the surplus was the remainder of the proceeds of the sale after payment of the reasonable expenses of the sale and FNBO's lien. As will be set out more fully in the discussion of the consolidated and summarized assignment of error No. 4, proceeds of the sale did not have to be applied to the liens of the Shaffers and Kleman. Therefore, the amount of the liens of the Shaffers and Kleman would not be deducted from the proceeds to determine the amount of surplus.

. FNBO's proposed instruction No. 10 referred to evidence of an agreement between CEC and Pine Ridge Management for the sale of 1,940 shares of FNB-Chadron. It then went on to state that the jury may not award damages based upon the failure or inability of CEC to complete that contract and to state that because of certain requirements contained in the agreement which were not accomplished and because the agreement had not yet been approved by the shareholders, the agreement was not binding upon CEC or Pine Ridge Management.

FNBO was not prejudiced by the court's refusal to give this instruction. Instruction No. 23, given by the trial court, stated how damages were to be calculated if the jury found that the sale had not been conducted in a commercially reasonable manner. That instruction was sufficient to ensure that the jury did not award damages based on the alleged contract between CEC and Pine Ridge Management.

Proposed instruction No. 11 discussed the so-called Pine Ridge Management agreement. It would have told the jury that in using that agreement, it would be necessary to deduct certain loans that were agreed to be charged off and to consider an amount of $870,000 that was to be placed in escrow for a period of 1 year to be used to satisfy any loan losses.

Again, FNBO was not prejudiced by the district court's refusal to give this instruction. It is unclear what purpose this instruction would have served other than to have confused the jury. Clearly, the jury did not need to make the calculations called for by the proposed instruction in following the

instructions given by the court that the measure of CEC's damages, if any, would not be the loss of the sale price if the contract with Pine Ridge Management had been fulfilled.

Finally, proposed instruction No. 12 made reference to the doctrine of estoppel. It recited that FNBO had alleged that it acted in reliance upon information provided to it by CEC relating to a call report that would reflect equity capital of $648,000. It then attempted to define "equitable estoppel or estoppel by misrepresentation," followed by instructions that if the jury found that FNBO had acted in reliance upon the representations of CEC regarding its call report, "then Chadron Energy Corporation is estopped from bringing this action against First National Bank of Omaha."

It is apparent that, even if FNBO was entitled to an instruction on estoppel, this proposed instruction does not correctly state the law. One of the key issues in dispute was whether the representations FNBO claimed were made by representatives of CEC had in fact been made. FNBO's proposed instruction assumes the truth of the fact that the representations were made and only instructs the jury to determine if FNBO relied upon the representations. Additionally, the alleged representations affect the reasonableness of the notice sent to potential bidders. Since the jury could find from the evidence introduced that other aspects of the sale were not commercially reasonable, a finding that CEC is estopped from denying the representations would not estop CEC from bringing this lawsuit, nor would it automatically entitle FNBO to a verdict in its favor.

## SECURITY INTERESTS OF SHAFFERS AND KLEMAN

The district court reasoned that FNBO's conversion of the stock in which the Shaffers and Kleman had security interests cut off the security interests, leaving the Shaffers and Kleman with tort claims for conversion against FNBO and no claims to the collateral or the proceeds of the sale. Therefore, according to the district court, FNBO could acquire no subrogation right to the proceeds by virtue of having settled the claims of the Shaffers and Kleman and acquired no right to the proceeds by virtue of the assignments from the Shaffers and Kleman.

Disputing the correctness of the district court's analysis, FNBO claims that the court should have dismissed the interpleader and released the money to it rather than releasing the money to CEC. FNBO argues that it is entitled to all of the sale proceeds, including the interpleaded funds, for the following reasons: (1) The senior security interests of the Shaffers and Kleman continued in the sale proceeds, and because of the nature of conversion, those security interests became the property of FNBO; (2) the Shaffers and Kleman assigned their interests to FNBO; and (3) FNBO was subrogated to the rights of the Shaffers and Kleman.

FNBO contends that the true holding of *CEC I* is that retention of proceeds from the sale constituted a conversion as to the senior lienholders, the Shaffers and Kleman. According to FNBO, a junior secured party has an obligation to turn over proceeds of a sale to the senior secured party and failure to do so constitutes a conversion. Therefore, argues FNBO, if it converted property rights of the Shaffers and Kleman and paid its liability to those parties, it is entitled to retain the benefit of the property rights which it allegedly converted, i.e., the sale proceeds, including the interpleaded funds.

In *CEC I*, this court concluded that FNBO's conversion of the stock occurred in October 1982 rather than November 1980. The court reasoned that in November 1980 FNBO did not in any manner diminish or extinguish the security interests of the Shaffers and Kleman when it exchanged the six stock certificates for one stock certificate and therefore the act of transfer did not constitute a conversion. The court also stated:

> Furthermore, although First National-Omaha did release the bank stock from its possession, ostensibly in derogation of its written assurance not to do so unless the Shaffers and Kleman gave written consent, this did not amount to a conversion on the part of First National-Omaha. First National-Omaha, by agreeing to hold the collateral for the benefit of the Shaffers and Kleman, the junior lienholders, created a bailor/bailee relationship between itself and Shaffers and Kleman. [Citation omitted.] While it is true that strict adherence to a formal contract for bailment establishes the obligation

of the bailee, *Bozell & Jacobs, Inc. v. Blackstone Terminal Garage, Inc.*, 162 Neb. 47, 75 N.W.2d 366 (1956), First National-Omaha's technical breach of the agreement did not amount to a conversion. A bailee may satisfy his obligation by a return of certificates of like kind, there being no obligation to return the identical certificates. [Citations omitted.] The agreement merely obligated First National-Omaha to hold 1,850 shares of First National-Chadron bank stock, and although there was a gap of time when First National-Omaha did not have possession of the stock, this does not mean that First National-Omaha converted the stock. When First National-Omaha recovered the stock, though it had been reregistered, it remained 1,850 shares of First National-Chadron bank stock.

For these reasons, then, the finding by the district court was in error. However, as we have indicated, the subsequent sale by First National-Omaha of this stock did constitute a conversion for which Shaffers and Kleman were entitled to seek damages.

*CEC I, supra* at 601-02, 379 N.W.2d at 749.

FNBO sold the stock over the protest of the Shaffers and without notice to Kleman. Unlike after the November 1980 transfer, after the October 1982 sale FNBO no longer held 1,850 shares of FNB-Chadron stock, and therefore FNBO's breach of the agreement was more than just a technical breach and did amount to a conversion of the stock in which the Shaffers and Kleman held security interests.

While it is true that this court did determine that after November 1980 the security interests of the Shaffers and Kleman were senior to the security interest of FNBO, this court did not say that FNBO was guilty of conversion because it failed to turn over proceeds of the sale to the senior secured parties. Such a holding would be unsupported by the Uniform Commercial Code.

Despite the senior secured status of the Shaffers and Kleman, when CEC defaulted, *under the code* FNBO was entitled to sell the 1,850 shares of FNB-Chadron securing CEC's debt. Neb.

U.C.C. § 9-503 (Reissue 1980) provides in part that "[u]nless otherwise agreed a secured party has on default the right to take possession of the collateral." Section 9-504(1) provides that "[a] secured party after default may sell, lease or otherwise dispose of any or all of the collateral . . . ." These sections make no distinction between secured parties of graduated priorities; they authorize "*a* secured party" to repossess the collateral upon default via self-help, if repossession is necessary, and to dispose of the collateral. There is no requirement that the secured party hold first priority status.

When CEC defaulted, FNBO, as a secured party, albeit a junior secured party, was authorized under the code to sell the collateral. FNBO was not guilty of conversion because it retained proceeds of the sale in satisfaction of CEC's indebtedness without first applying proceeds to the satisfaction of the security interests of the Shaffers and Kleman. Section 9-504(1) provides that proceeds of a foreclosure sale are to be applied in the following order: (1) to the reasonable expenses of the sale, (2) to the satisfaction of the indebtedness secured by the security interest under which the disposition is made, and (3) to the satisfaction of indebtedness secured by any *subordinate* security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed. If there are any proceeds remaining, they go to the debtor. § 9-504(2). The code does not require distribution of proceeds to the satisfaction of senior security interests when a junior secured party conducts a foreclosure sale.

However, despite the right FNBO had under the code to sell the collateral, it had created a bailor/bailee relationship between itself and the Shaffers and Kleman and had agreed not to release the collateral from its possession until notified by the Shaffers and Kleman that their security interests had been released or discharged. This court has previously held that a special contract of bailment prevails in determining the liabilities of the parties, as against general principles of law applicable in the absence of express agreement. *Bozell & Jacobs, Inc. v. Blackstone Terminal Garage, Inc.*, 162 Neb. 47, 75 N.W.2d 366 (1956). When FNBO sold the stock in breach of the bailment agreement, it was guilty of conversion whether the

security interests of the Shaffers and Kleman were junior or senior to the security interest of FNBO.

In settling the conversion claims of the Shaffers and Kleman, FNBO in effect purchased their interests in the stock. As a general rule, one converting the property of another who pays to the owner the value of the property converted becomes, by operation of law, the owner of the property. See, *Foley v. Dick*, 436 So. 2d 139 (Fla. App. 1983); *Mason v. Schumacher*, 231 Neb. 929, 439 N.W.2d 61 (1989). To determine what interests FNBO thereby acquired, it is necessary to determine the interests of the Shaffers and Kleman after the sale.

*The Interests of the Shaffers and Kleman in the Collateral After the Sale.*

Neb. U.C.C. § 9-306 (Reissue 1980) deals with a secured party's rights upon disposition of the collateral other than by the secured party. Section 9-306(2) provides:

> Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

In 1980, the Nebraska Legislature amended § 9-306(2) by deleting the phrase "by the debtor" following "sale, exchange or other disposition thereof." Therefore, even if the disposition is not by the debtor, a secured party's security interest continues in the collateral unless one of the conditions specified in § 9-306(2) for cutting off the security interest is satisfied. See *El Paso County Bank v. Charles R. Milisen & Co.*, 622 P.2d 594 (Colo. App. 1980).

Section 9-306(2) provides that a security interest continues in the collateral after a sale, exchange, or other disposition unless (1) otherwise provided in article 9 of the code or (2) the secured party authorized the disposition.

Article 9 does not "otherwise" provide that a senior secured party's security interest in the collateral is cut off by a disposition by a junior secured party. Section 9-504(4) provides:

> When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien *subordinate* thereto. The purchaser takes free of all such rights and interests . . . .

(Emphasis supplied.) Under § 9-504(4) only subordinate security interests and liens are cut off. A senior secured party's interest in the collateral is not discharged by a junior secured party's foreclosure sale, and the collateral in the hands of the purchaser is subject to the senior secured interest. See, 2 J. White & R. Summers, Uniform Commercial Code § 27-9 (3d ed. 1988); R. Duncan & W. Lyons, The Law and Practice of Secured Transactions: Working with Article 9 § 5.04[4] (1990).

FNBO's sale of the stock was not authorized by the Shaffers and Kleman, either in the security agreements or "otherwise."

Neither of the conditions specified in § 9-306(2) for cutting off a security interest in collateral having been satisfied, the security interests of the Shaffers and Kleman continued in the stock after the sale. By settling the conversion claims of the Shaffers and Kleman, FNBO acquired their continuing security interests in the stock. This, however, does not support FNBO's claim of entitlement to the proceeds of the sale, including the interpleaded funds.

*The Interests of the Shaffers and Kleman in the Proceeds After the Sale.*

Section 9-306(2) provides that after sale, exchange, or other disposition, a security interest continues "in any identifiable proceeds including collections received by the debtor." Unlike the continuing security interest in the collateral, whether the sale was authorized does not affect the secured party's continuing interest in the proceeds. See, *Norfolk Prod. Credit Assn. v. Bank of Norfolk*, 220 Neb. 593, 371 N.W.2d 276 (1985); 9 R. Anderson, Uniform Commercial Code §§ 9-306:11 and 9-306:23 (3d ed. 1985).

When the disposition of the collateral is by a junior secured party, what is the interest of a senior secured party in the proceeds of the disposition? The security interest of the senior

secured party continues only in those proceeds of the disposition that are received by the debtor.

As previously stated, the distribution scheme specified in § 9-504(1) does not provide for distribution of any of the proceeds to the satisfaction of indebtedness secured by a senior security interest. Therefore, a continuing security interest of the senior secured party in proceeds of the sale properly distributed to other secured parties pursuant to § 9-504(1) would be inconsistent with the distribution scheme of § 9-504(1). However, if the disposition of the collateral by a junior secured party produces a surplus which the debtor is entitled to receive pursuant to § 9-504(2), such proceeds are subject to the continuing security interest of the senior secured party.

Despite FNBO's contention to the contrary, the security interests of the Shaffers and Kleman did not continue in the proceeds of the sale retained by FNBO as reimbursement for the expenses of the sale and in satisfaction of CEC's debt. However, the Shaffers and Kleman did have continuing security interests in those proceeds of the sale to which CEC was entitled, i.e., the surplus proceeds represented by the interpleaded funds.

By settling the conversion claims of the Shaffers and Kleman, FNBO acquired their continuing security interests in the surplus proceeds/interpleaded funds.

Furthermore, in their settlements with FNBO, the Shaffers and Kleman assigned to FNBO the promissory notes from the members of the Wulf Group and their rights to and interests in the proceeds of the sale of the FNB-Chadron stock. Since the security interests of the Shaffers and Kleman continued in the surplus proceeds/interpleaded funds, FNBO also has an interest in the interpleaded funds by virtue of the assignments.

FNBO also argues that it is entitled to the proceeds, including the interpleaded funds, because the theory of subrogation would clearly give it the right to the sale proceeds because it was compelled to pay a debt that was owed to the Shaffers and Kleman and which was to be paid from the proceeds of the sale of the stock.

As discussed above, FNBO is incorrect in asserting that proceeds of the sale had to be paid to the Shaffers and Kleman

to pay the debt of the Wulf Group. Furthermore, the doctrine of equitable subrogation is inapplicable in this case.

Subrogation is defined as the substitution of one person in the place of another with reference to a lawful claim, demand, or right, so that the one who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities. *J. J. Schaefer Livestock Hauling v. Gretna St. Bank*, 229 Neb. 580, 428 N.W.2d 185 (1988). " ' "Subrogation is the right of one, who has paid an obligation which another should have paid, to be indemnified by the other." ' " (Emphasis omitted.) *Id*. at 591, 428 N.W.2d at 192 (quoting *State Auto. & Cas. Underwriters v. Farmers Ins. Exchange*, 204 Neb. 414, 282 N.W.2d 601 (1979)). The doctrine of subrogation includes every instance in which one person pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter, so long as the payment was made under compulsion or for the protection of some interest of the one making the payment and in discharge of an existing liability. *J. J. Schaefer Livestock Hauling v. Gretna St. Bank, supra*. The doctrine applies where a party is compelled to pay the debt of a third person to protect his own rights or interest, or to save his own property. *Rawson v. City of Omaha*, 212 Neb. 159, 322 N.W.2d 381 (1982). Subrogation is not allowed where the debt paid is one for which the payor is primarily liable. See, *J. J. Schaefer Livestock Hauling v. Gretna St. Bank, supra*; *Luikart v. Buck*, 131 Neb. 866, 270 N.W. 495 (1936).

The money FNBO paid to the Shaffers and Kleman was in payment of their conversion claims. Equitable subrogation does not apply in this case because FNBO was itself "primarily liable" for the debt it paid, since FNBO and FNBO alone was liable for conversion. It simply paid its own debt and is not to be subrogated to anyone's rights. See *J. J. Schaefer Livestock Hauling v. Gretna St. Bank, supra*.

From the foregoing discussion it is clear that the district court erred in ordering the interpleaded funds released to CEC. Despite FNBO's conversion, the security interests of the Shaffers and Kleman continued in the collateral and the surplus proceeds of the sale. FNBO acquired the security interests of the

Shaffers and Kleman in the surplus proceeds/interpleaded funds when it settled their conversion claims and by virtue of the assignments.

It must, however, be remembered that the security interests of the Shaffers and Kleman in the FNB-Chadron stock gave them a secured position in the event of nonpayment by the Wulf Group. There having been no default by the Wulf Group when the stock was sold, the Shaffers and Kleman could have claimed the surplus proceeds/interpleaded funds only by virtue of their continuing security interests which, given that the proceeds were money, could be perfected only by possession. They could not have applied the proceeds to the debts of the Wulf Group; they could only have held the proceeds as security against nonpayment by the Wulf Group. In the event the members of the Wulf Group paid off their debts to the Shaffers and Kleman, CEC would then be entitled to the surplus proceeds/interpleaded funds.

FNBO having acquired, by settlement of the conversion claims and by virtue of the assignments, the security interests of the Shaffers and Kleman and the promissory notes representing the debts those security interests secured, FNBO is entitled to hold the interpleaded funds in order to perfect its security interests but can only hold the money as security against nonpayment by the Wulf Group. Therefore, whether FNBO or CEC is ultimately entitled to the interpleaded funds depends on whether the members of the Wulf Group default on their debts and the extent of any defaults, and the entitlement to the funds cannot be decided by this court in this appeal.

In the event the jury on retrial determines that CEC did suffer a loss of additional surplus because FNBO failed to conduct a commercially reasonable sale, the additional surplus recovered by CEC is not subject to the continuing security interests in the surplus proceeds/interpleaded funds now held by FNBO. Although such additional surplus is proceeds that should have been received from the sale, it is not proceeds actually received from the sale and therefore does not come within § 9-306.

## EXCLUSION OF CERTAIN EVIDENCE

The admission or exclusion of evidence is initially left to the discretion of the trial court, which must determine the relevancy and possible prejudicial effects of the proffered evidence. *Wright v. Forney*, 233 Neb. 258, 444 N.W.2d 895 (1989).

FNBO contends that the district court erred in excluding exhibits 245, 249, 258, and 259. It did not argue its complaint about exhibit 245 in its brief, and therefore we will not consider it.

Exhibit 249 is a letter written by one of CEC's attorneys to Larry Tarrant. The letter, written after the sale, was sent to Craig Madson, a representative of CEC, for his review, with instructions to send it on if it met with his approval. There is no evidence the letter was ever sent on to Tarrant, and the letter was cumulative evidence. To the extent that it therefore cannot be said that the trial court abused its discretion in excluding the letter, we need not address whether the letter was properly excluded because it was privileged or work product.

Testimony sought to be elicited from one of CEC's attorneys, the same person who authored the letter mentioned above, was also cumulative to evidence elicited from other witnesses throughout the trial, and its exclusion was not error.

Exhibit 258 related to evidence of a lawsuit filed by CEC against former directors of CEC and FNB-Chadron in which CEC claimed that all of its losses and damages resulted from the negligence of the directors, and exhibit 259 related to evidence of settlement of the suit for $800,000. According to FNBO, CEC's recovery was not from a collateral source and CEC's claims in that lawsuit were contradictory to CEC's claims in this lawsuit.

Under the collateral source rule adopted by this court, the fact that the party seeking recovery has been wholly or partially indemnified for a loss by insurance or otherwise cannot be set up by the wrongdoer in mitigation of damages. See, *Tetherow v. Wolfe*, 223 Neb. 631, 392 N.W.2d 374 (1986); *Huenink v. Collins*, 181 Neb. 195, 147 N.W.2d 508 (1966). According to this court:

This rule [the collateral source rule] provides that benefits

received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer. The theory underlying the adoption of this rule by a majority of jurisdictions is to prevent a tort-feasor from escaping liability because of the act of a third party, even if a possibility exists that the plaintiff may be compensated twice.

*Hiway 20 Terminal, Inc. v. Tri-County Agri-Supply, Inc.*, 232 Neb. 763, 767, 443 N.W.2d 872, 875 (1989).

FNBO is correct inasmuch as it asserts that the collateral source rule is inapplicable in this case. However, for the same reason that the collateral source rule is inapplicable, evidence of the lawsuit by CEC against former directors is irrelevant.

Contrary to FNBO's contention, CEC was not seeking recovery for the same losses and damages in the lawsuit against former directors for which it is seeking recovery in this lawsuit. By virtue of the conduct of the former directors and by virtue of the conduct of FNBO, CEC suffered two separate and distinct losses. The actions of the former directors, including the making of some illegal loans tangentially related to an effort by the Wulf Group to sell its stock to CEC, resulted in difficulties for FNB-Chadron which affected the bank's earnings. This in turn resulted in loss of dividends for CEC, which rendered CEC unable to pay off the debt to FNBO and resulted in FNBO's sale of the FNB-Chadron stock. CEC instituted suit against the former directors to recover for the loss of CEC's primary asset, the FNB-Chadron stock.

On the other hand, CEC alleges that the actions of FNBO in failing to conduct a commercially reasonable sale of the FNB-Chadron stock resulted in a sale of the stock at a price lower than it should have been. CEC instituted suit against FNBO to recover for the loss of additional surplus proceeds.

Since CEC's recovery from the former directors does not compensate CEC for the alleged loss of additional surplus proceeds due to the commercially unreasonable sale of the FNB-Chadron stock, the collateral source rule is inapplicable. Additionally, because the recovery from the former directors was for a different loss, evidence of the lawsuit and recovery

was irrelevant to the issues of the commercial reasonableness of the sale and the amount of loss suffered by CEC if the sale was commercially unreasonable.

The exclusion of exhibits 258 and 259, the petition and the settlement agreement and release in the suit against the directors, was not erroneous.

Finally, FNBO objects to the admission of testimony as to what Robert Isham was willing to pay for the stock a few months prior to the forced sale. If the jury found that the sale was not commercially reasonable, this evidence would be relevant as to fair and reasonable value. FNBO was allowed ample opportunity to present evidence that CEC was or would be unable to fulfill the conditions set out in the agreement before the sale would go through. FNBO was also allowed to present evidence regarding the effect of subsequent events, i.e., losses due to write-offs of bad loans, etc. The district court did not err in receiving this evidence.

## ESTOPPEL OF CEC

The claim as to estoppel of CEC from asserting facts other than those relied on by FNBO has been discussed earlier in respect to a tendered instruction by FNBO. FNBO argues that Madson represented to representatives of FNBO that the September 30, 1982, call report, to be published on November 1, 1982, would reflect capital of $648,000. FNBO contends that it then gave notice and conducted the sale in reliance upon this information and that therefore CEC should not be allowed to assert an action against FNBO, because FNBO acted in reliance upon information given by CEC. There are two flaws in FNBO's reasoning. First, whether Madson made the representations FNBO claims he made was a hotly contested issue at trial. Whether the representations were made and, if they were, whether FNBO relied upon them were questions for the jury to decide, not the judge. Second, even if CEC were estopped from asserting that the representations FNBO attributed to representatives of CEC were not made, the issue went to only one aspect of the sale. There are other factors that go into the determination of whether the sale was commercially reasonable, and therefore CEC would still be entitled to bring

an action against FNBO even if FNBO did give notice and conduct the sale in reliance on the disputed representations.

The judgment of the district court is reversed and the cause remanded for a new trial on damages.

REVERSED AND REMANDED FOR A NEW TRIAL ON THE ISSUE OF DAMAGES.