WAITE LUMBER COMPANY, INC., A CORPORATION, APPELLEE, v. MASID BROS., INC., ET AL., APPELLANTS, IMPLEADED WITH CAMERON E. GRAY ET AL., APPELLEES.

200 N. W. 2d 119

Filed August 4, 1972. No. 38247.

Robert M. Harris and Van Steenberg, Winner & Brower, for appellants.

Wright & Simmons, for appellee Waite Lumber Co., Inc.

James R. Hancock, Orie C. Adcock, and W. A. Herman, for appellees Gray et al.

Heard before SPENCER, SMITH, and NEWTON, JJ., and STUART and BUCKLEY, District Judges.

BUCKLEY, District Judge.

This is an action for foreclosure of five mechanic's liens, brought against Masid Bros., Inc., owner of the land involved, and Hartford Accident and Indemnity Company, who allegedly had given a bond in substitution for the land pursuant to section 52-121, R. R. S. 1943. The trial court found in favor of all lien claimants but judgment as to all but Cameron E. Gray, doing business as Gray's Plumbing and Heating have been satisfied. Masid and Hartford appeal from Gray's judgment against them.

Masid is a corporation wholly owned by brothers Leo Masid, vice president, and Sammy Masid, president. Masid was the fee owner of a one story brick building in Scottsbluff, Nebraska. Half of the building had been leased in March 1968, to Western Office Supply Company. On September 2, 1969, Masid leased the other half of the building to Chris Verges for use as the Beefeaters Restaurant and Lounge. The written lease provided for a term of 10 years commencing November 5, 1969, with rent of $500 per month for the first 5 years

and $600 per month thereafter, with a 5-year option to renew. The lease also provided that: "It is agreed that the leased premises will be remodeled by Second Party (Verges), at Second Party's (Verges) sole cost, which remodeling will include decorating, it being further agreed that First Party (Masid) will bring all utilities to the leased premises, to include water, natural gas, electrical power and sanitary sewer, and in addition, will enclose the open pipes in the building and enclose the air-conditioners in the building. First Party (Masid) further agrees to rough-in for two toilets, all necessary plumbing, to include water, hot and cold and sanitary sewer. . . .

"It is agreed that all equipment and fixtures of Second Party (Verges) may be removed on the termination of this lease, under the terms thereof, but that anything attached to the building, to include false ceiling, partitions or carpeting will remain a part of the building."

Verges entered into verbal agreements with various contractors and material suppliers to do the necessary work, including the work required by the lease of Masid. All bills were submitted to Verges and all payments made on the claimants' accounts were made by Verges. None of the claimants had any written contract with Masid, either for Masid's portion of the work required by the lease or in the form of an agreement to be responsible for Verges' debts.

Verges operated the Beefeaters from March 1970, until the first week in July 1970, when, suddenly and unexpectedly, he abandoned the premises taking some of the equipment with him. Masid locked the building, later replaced the equipment taken by Verges, and in December 1970, leased the same premises to Copper Kettle, Inc.

The trial court did not set forth a basis for its judgment. Masid's principal contention is that Gray's lien could not attach to Masid's fee title because he had no contract with Masid, express or implied, as required by

the mechanic's lien statute but only with Verges, the tenant, who was not Masid's agent for that purpose.

We have said that a tenant cannot without the authority of the landlord charge the land with a lien for materials for constructing or improving a building thereon, and the tenant is not the landlords' agent for this purpose, even if he has the landlord's consent. Platner Lumber Co. v. Krug Park Amusement Co., 131 Neb. 831, 270 N. W. 473; Waterman v. Stout, 38 Neb. 396, 56 N. W. 987; Moore v. Vaughn, 42 Neb. 696, 60 N. W. 914; Frost, Curyea & Murtey v. Ronne, 113 Neb. 655, 204 N. W. 387.

Gray contends that the equitable doctrine of merger should apply, whereby, upon the abandonment by Verges of his leasehold estate, and Masid's reentry and reletting of the premises, the leasehold and fee estates merge, subjecting Masid's fee to the payment of Gray's lien. We agree.

Although a mechanic's lien when filed attaches only to an equitable estate, it may be enforced against the fee after the equitable and legal titles have merged. Central Construction Co. v. Highsmith, 155 Neb. 113, 50 N. W. 2d 817; Harte v. Shukert, 94 Neb. 210, 142 N. W. 517.

The general rule is that where two unequal estates vest in the same person at the same time without an intervening estate, the smaller is thereupon merged in the greater. Peterborough Savings Bank v. Pierce, 54 Neb. 712, 75 N. W. 20; American Savings & Loan Assn. v. Barry, 123 Neb. 523, 243 N. W. 628; Central Construction Co. v. Highsmith, *supra.*

But, in equity the common law legal rule as to merger is not always followed, and the doctrine of merger is not favored. Equity will prevent or permit a merger as will best subserve the purposes of justice and the actual and just intent of the parties, whether express or implied. American Savings & Loan Assn. v. Barry, *supra;* Watson v. Dalton, on rehearing, 146 Neb. 86, 20

N. W. 2d 610; 53 Am. Jur. 2d, Mechanic's Liens, § 322, p. 850; 28 Am. Jur. 2d, Estates, § 381, p. 589.

This court has said: "But merger does not always or necessarily result from such a coinciding of such estates. . . . Whether the two estates will be held to have coalesced will depend upon the facts and circumstances in the particular case, the then intention of the party acquiring the two estates, and the equities of the parties to be affected." Peterborough Savings Bank v. Pierce, *supra.* See, also, Central Construction Co. v. Highsmith, *supra.*

In American Savings & Loan Assn. v. Barry, *supra,* we said: ". . . in determining whether a merger has taken place the court will consider the circumstances of the particular case in the light of equity and good conscience."

On at least three occasions this court has applied equitable principles to decide whether to merge a leasehold estate with mechanic's lien attached with the fee. In Harte v. Shukert, *supra,* the lessee of an apartment building spent more than $70,000 on permanent improvements with the consent of the owner. The lessee became insolvent and was adjudged a bankrupt. The trustee, pursuant to a void order, surrendered the leasehold estate to the owner who remodeled the improved building and relet parts of it. There we observed: "Shukert knew what was being done on the premises by Hanson and Harte, and observed the progress made by them in improving his property. Months before Hanson began to remodel the building, Shukert knew of his tenant's intention to improve it in a manner requiring the outlay of large sums of money. He stood by for more than a year and saw improvements made at the rate of thousands of dollars a month until the aggregate exceeded $70,000. He knew Harte's connection with the work, and during a portion of the time visited the premises daily. For the entire period covered by these expenditures, no rent was ever paid when

due. While the property was being improved, Shukert did not exact payment of the monthly rentals according to the terms of the lease or attempt to exercise his option to cancel it. Had he done so, the situation of Hanson and Harte would have been changed. In that event their improvements and expenses would have been stopped at the end of the first month of the term. . . .

"It is further argued that the decree is erroneous because it permits the fee to be sold to satisfy Harte's lien, which attached only to the leasehold of Hanson. There were two estates, the fee and the leasehold. That Shukert owns the fee is unquestioned. After he assumed to forfeit the lease, he took possession of the demised premises and of all the improvements made by Hanson and Harte, and ever since has used both estates as his own property. He remodeled the improved building at a cost of $15,000, and leased different parts of it to different persons. He has not kept the estates separate, and for the purposes of the lien has merged the leasehold in the fee."

In Platner Lumber Co. v. Krug Park Amusement Co., *supra*, the leasehold estate lienholder relied upon Harte v. Shukert, *supra*, to urge merger of the estates. There the Cassel Realty Company leased to Krug Park Amusement Company land in Omaha, Nebraska, known as Krug Park, and used by the lessee as an amusement park. The lessee was constantly and increasingly delinquent in rent payments during which time the lessee contracted with Platner Lumber Company and others to rebuild the bathhouse destroyed by fire in 1932. In the winter of 1933 the lessee did not pay the watchman, but the owner, being interested in some of the buildings, paid the watchman so that he would not abandon the premises. After the Krug Park Amusement Company went into bankruptcy, the Cassel Realty Company did not lease the premises, but agreed with a former officer of the lessee to run the park by arrangement with Krug Park Amusement Company if he paid $50 per day. But it refused

to insure his possesion as against the lessee or anyone claiming through or under it. There we said: "It does not necessarily follow that an estoppel against the landlord to exercise an option to forfeit the lease because the rent has not been paid causes a merger of the estates and an attachment of the lien to the fee. Such cannot be the fact when the evidence discloses, as in this case, that there has been no merger of the leasehold with the fee; that there has been no forfeiture; and that the estates remain separate and distinct, not only as a matter of fact, but because the landlord is estopped to exercise the option of forfeiture. . . .

"The facts in the case at bar and the Shukert case are distinguishable because in that case the landlord illegally took possession and appropriated the leasehold interest, including the expensive improvements erected by the lessee, to his own use and benefit, to the exclusion of a lienholder."

In Central Construction Co. v. Highsmith, *supra*, the land was owned by Wholesalers Adjustment Company, who on August 1, 1946, contracted to sell it for $1,300 to Highsmith, who took possession. While making payments on the contract he mortgaged the property to the Bilbys on October 3, 1946. On January 16, 1947, Highsmith contracted for the construction of a porch to the house for $1,180, resulting in a lien and a proceeding for its foreclosure. On January 18, 1947, the adjustment company deeded the property to the Ehlers, and Highsmith assigned his contract to Ehlers. The interests of the Ehlers are not too clearly defined, but on the whole it is clear that Mrs. Ehlers owned the title. The deed and assignment were recorded in October 1947, at which time Bilbys released the mortgage and Highsmith gave a quitclaim deed. Mr. Ehlers claims to have paid for the deed, assignment, release, and quitclaim deed. Ehlers claimed title to the propery and that the mechanic's lien was null and void. There we said: "Mr. Ehlers testified that he paid the amount due under

the contract and obtained the adjustment company deed. By deed from Highsmith, Mrs. Ehlers secured whatever interest he had in this property and performed the Highsmith contract. A clear intention to merge the titles is shown. The equities all require that it be held that a merger of the adjustment company's legal title and Highsmith's equitable title occurred when Mrs. Ehlers acquired both estates. . . . Although a mechanic's lien when filed attaches only to an equitable estate, it may be enforced against the fee after the equitable and legal titles have merged. . . . It further follows that the mechanic's lien, if valid, is a lien on the fee title shown to be held by Mrs. Ehlers."

In light of these decisions, we turn to the instant case. Both Masid and Verges were obligated to improve the south half of the building to make what was an open area into a restaurant and lounge. The improvements required of Verges were substantial, indicating that they would not have been made except in contemplation of their use by Verges during the 10-year term plus 5 years option to renew fixed by the lease.

Masid was totally familiar with the improvements Verges contracted for, including those required of Masid. There was some form of arrangement between Masid and Verges whereby Verges undertook the entire job, but Leo Masid denied Verges was Masid's agent or that Masid had any arrangement to repay Verges for its share, except to say that, "He owed us money."

Construction began about November 20, 1969, and finished in early March 1970. Verges made the required rent payments on November 5, 1969, and December 5, 1969, but none thereafter, and thus was in default during most of the construction period. Masid never exercised its option to forfeit or cancel the lease, but rather stood by and let Gray and the other material and labor suppliers finish the job. Leo Masid, in fact, visited the site almost daily and was consulted numerous times by Allen Crecilius, general foreman of the work, about

those items Leo agreed were Masid's responsibility.

After Verges suddenly abandoned the premises, for reasons unknown, Masid took immediate possession to protect its property. While Verges' actions were not indicative of any intent to return to the premises, there is no evidence that Masid attempted to communicate with Verges or give Verges any notice of forfeiture or cancellation of the lease. Yet Masid proceeded to make some improvements and then lease the property to Copper Kettle, Inc., less than 6 months after Verges left. The lease to Copper Kettle, Inc., was for the same monthly rental and makes no mention of the Verges lease or any claimed equitable interest of Verges in the premises. Thus Masid by its action clearly intended to foreclose Verges from any and all leasehold estate he had. Masid, however, argues that by virtue of our holdings in Bernstein v. Seglin, 184 Neb. 673, 171 N. W. 2d 247, it had no choice but to relet the premises to mitigate damages. There we held, overruling a prior decision, that a landlord may not unreasonably refuse to accept a qualified and suitable tenant for the purpose of mitigating the damages recoverable from a tenant who has abandoned the leased premises prior to the expiration of the term. But even if Masid had a positive duty to relet the premises, it was not necessarily penalized by having a merger occur as a matter of law, for, as we previously stated, such a merger that would make Masid liable for Gray's lien will occur only if equity and good conscience so dictate.

That such a merger should result here becomes evident when we examine the position of the parties at the time Masid relet to Copper Kettle, Inc. It now owned a building, half of which had been completely changed into a restaurant and lounge, at a cost of nearly $20,000, of which Masid paid nothing and Verges paid over $8,000, notwithstanding the lease called for a significant portion of the improvement to be made by Masid. The construction included the completion of a partial con-

crete block wall into a complete, permanent fire wall, cut through and above the roof 18 inches. Internal structuring was done to result in a kitchen, table and chair area, including the bar, a banquet room, a store-room and office, and two restrooms. The floor was car-peted, steam pipes and heating units were covered, all the usual equipment for the bar, kitchen, and restrooms were installed, and the necessary plumbing and electri-cal installations were completed. Verges operated the restaurant only 4 months of the 10-year lease. When Verges left he removed the tables and chairs, the bar, and the kitchen range. Masid replaced these and changed some electrical facilities before reletting. The cost of this is not shown, but it comprises only a minor portion of the total improvements made. Masid was in a position to lease a completely furnished and equipped restaurant and lounge, which it did, and it is signifi-cant that the new lease makes no mention of any im-provements to be made by either Masid or Copper Kettle, Inc., obviously because none were needed.

To allow Masid to so enrich itself at the expense of Gray, and the other lienholders, would produce an un-conscionable result, which equity will not permit.

There is due and owing to Gray the sum of $6,101.17, and he has a valid lien on the fee title of Masid for that amount. The trial court's judgment was correct.

Appellant Hartford claims that the judgment against it should be reversed for want of proof.

Gray, in his cross-petition, alleged: "That Hartford . . . has written its bond in substitution for the land herein described, and this Defendant is entitled to judg-ment against Hartford . . . for $6,101.17, costs, interest and equitable relief." No copy of the alleged bond was attached to the cross-petition. Masid and Hartford de-nied generally all allegations of the lien claimants not expressly admitted.

A general denial is available to a defendant to chal-lenge one or more of the elements essential to a re-

covery by the plaintiff, and the effect of the denial is to put the burden on the plaintiff to establish by evidence the matters denied. Master Laboratories, Inc. v. Chesnut, 154 Neb. 749, 49 N. W. 2d 693.

No evidence whatsoever was offered as to even the existence of the alleged bond. Gray has wholly failed to prove any essential element of this cause of action. There was no basis for the trial court's judgment against Hartford and it shoud be reversed.

Appellants assign as error the trial court's finding that Verges had been properly summoned as a party. Verges was served personally in Montrose County, Colorado, by the sheriff of that county. He did not appear at the trial and no judgment was rendered against him.

The validity of the service on Verges is not material because Verges was not a necessary party to the action. The liens were filed against Masid's fee title. Gray's action to foreclose the lien was filed on August 28, 1970, well after Verges abandoned and Masid reentered the premises. When Masid leased to Copper Kettle, Inc., Verges no longer had any interest in the property.

"An abandonment of leased premises by the tenant constitutes an offer to terminate the lease, and an abandonment or surrender of the leased premises, together with an acceptance by the landlord, as by resumption of possession, may constitute a surrender by operation of law." 51C C. J. S., Landlord and Tenant, § 125(1), p. 398. ". . . whether there has been an acceptance by the landlord of the tenant's abandonment of the premises is largely a matter of intention, and such an acceptance may be inferred from acts of the landlord inconsistent with the continuance of the lease." 51C C. J. S., Landord and Tenant, § 125(4), p. 402.

We conclude that from the conduct of Verges and Masid as previously described, a surrender of the lease occurred, terminating any interest of Verges in the property. A person whose leasehold interest is terminated, in premises upon which there is a mechanic's lien, is

not a necessary party to a petition for foreclosure. See, McCormick v. Lawton, 3 Neb. 449; Pickens v. Polk, 42 Neb. 267, 60 N. W. 566; Glover v. Hargadine-McKittrick Dry Goods Co., 62 Neb. 483, 87 N. W. 170.

The judgment of the district court against Hartford is reversed and the cause is remanded with directions to dismiss the action as to Hartford. The judgment of the district court in all other respects is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.