JAMES B. FRANKSEN, DOING BUSINESS AS J.B. FRANKSEN & ASSOCIATES, ET AL., APPELLEES, V. CROSSROADS JOINT VENTURE, APPELLANT, AND GRAFFITI EATERY, INC., ET AL., APPELLEES.

599 N.W. 2d 603

Filed September 3, 1999. No. S-98-212.

598

Patrick B. Griffin and Marcia A. Judd, of Kutak Rock, for appellant.

Martin P. Pelster, of Croker, Huck, Kasher, DeWitt, Anderson & Gonderinger, P.C., for appellees James B. Franksen, doing business as J.B. Franksen & Associates, et al.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

STEPHAN, J.

This case originated as an action filed by James B. Franksen, doing business as J.B. Franksen & Associates, to foreclose a construction lien he had filed on behalf of himself and various subcontractors who supplied labor and materials for the construction of the Graffiti Eatery restaurant on premises within the Crossroads Mall in Omaha, Nebraska. The premises were leased from Crossroads Joint Venture (CJV), the owner of the property. Franksen originally appealed from an order of the district court for Douglas County denying his motion for summary judgment and granting that of CJV. In *Franksen v. Crossroads Joint Venture*, 245 Neb. 863, 515 N.W.2d 794 (1994), we reversed, and remanded for further proceedings based upon our determination that although CJV was not a "contracting owner" as defined by the Nebraska Construction Lien Act, Neb. Rev. Stat. §§ 52-125 to 52-159 (Reissue 1998), summary judgment was

inappropriate because of disputed issues of fact with respect to whether "the equitable doctrine of merger dictates that the termination of the leasehold estate caused the leasehold estate and the attached construction lien to merge into the fee simple estate, thereby making the construction lien enforceable against CJV's interest in the property." 245 Neb. at 872, 515 N.W.2d at 802.

While *Franksen, supra,* was on appeal, the subcontractors filed another action in the district court for Douglas County to foreclose separate liens they had filed against the same property. See Formcraft Corp. et al. v. Crossroads Joint Venture, Douglas County District Court, docket 913, page 59. Because these two cases arose out of the same transaction and involved the same issue, the district court consolidated them for trial. Prior to trial, the district court discharged the liens against the property and transferred them to a bond filed by CJV. Also prior to trial, Franksen assigned his interest in the claims asserted in *Franksen, supra,* to the subcontractors-plaintiffs in the second action. The consolidated actions were then tried to the district court, which determined that the equitable doctrine of merger was applicable and that the construction liens were therefore enforceable against the fee estate. Based upon this determination, the district court entered judgment against CJV in favor of each of the nine subcontractors in the total amount of $363,845.94, together with prejudgment interest. CJV commenced this appeal, which we transferred to our docket on our own motion. Based upon our de novo review of the record, we reach the same conclusion as the district court and therefore affirm its judgment.

## I. BACKGROUND

Appellant CJV is the owner of the Crossroads Mall in Omaha, Nebraska. At all relevant times, Melvin Simon & Associates, Inc. (Simon), acted as an agent for CJV and a local management company managed the Crossroads Mall for Simon on behalf of CJV. Graffiti Eatery, Inc. (GEI), and Hawbaker & Associates, Inc., are entities owned by Timothy Hawbaker, who is the sole incorporator of both entities. Hawbaker & Associates was the general contractor for the construction of the Graffiti Eatery restaurant in the Crossroads Mall (the project). Franksen was the

project designer, store planner, and construction manager. Appellees Formcraft Corporation; Blair Glass Company, Inc.; Controlled Comfort Engineering, Inc.; Ancona Brothers Company, Inc.; Kehm Contractors, Inc.; Kennedy Studios, Inc.; Meehan-Radachi, Inc.; Taylor Plumbing, Inc.; and Wiedeman Electrical Service are the subcontractors who provided labor, services, and materials to the project for which they have not received compensation.

In early 1990, Hawbaker contacted Dale Kline, a leasing representative for CJV, to inquire about leasing space in the Crossroads Mall for the purpose of operating what he had initially planned to be an ice cream parlor. Negotiations between Hawbaker and Kline continued until June, at which time the concept of a full-service restaurant was developed and Hawbaker and CJV agreed to terms that were to be incorporated into a lease agreement between CJV and GEI. The terms provided for construction of leasehold improvements by GEI under a 15-year lease to be guaranteed by Timothy and Julie Hawbaker, Richard and Beverly Mulholland, and Gerald and Faye Dorwart. GEI was required to obtain a $300,000 letter of credit before commencing construction. CJV required the letter of credit in order to "solidify" its perception of Hawbaker's financial strength. The parties also agreed that GEI would supply proof of payment to the subcontractors on a continuing basis, specifically, no later than 2 weeks after completion of their specific work.

In addition, Hawbaker and Kline agreed that CJV would provide a $112,000 landlord's contribution and a loan for a $100,000 "Tenant Finish Allowance" toward construction expenses to be guaranteed personally by the Hawbakers, the Mulhollands, and the Dorwarts. GEI was to receive the contribution and loan only after the restaurant opened and lien waivers were received. CJV believed that a full-service restaurant at the Crossroads Mall would be beneficial to the mall's overall development and helped Hawbaker develop the concept of the Graffiti Eatery restaurant. Plans called for opening the restaurant before the 1990 holiday season, which each party thought would be to its benefit.

While negotiating the terms of the lease with Kline, Hawbaker contacted Franksen. In June 1990, Franksen entered into an agreement with Hawbaker pursuant to which Franksen was to act as the project designer, construction manager, and store planner. Both Hawbaker and Franksen contracted with the subcontractors to perform work on the project. The subcontractors had no contract with CJV but relied on Franksen to communicate with CJV on their behalf. Franksen testified that before construction commenced, he received and read a "Tenant Manual" regarding CJV's design criteria. The manual set out the tenant's and landlord's duties on the project. It specifically provided that all items of construction not listed in the manual were to be at the sole expense of the tenant.

The project improvements included a "pop-out," which consisted of a permanent structural modification of an existing exterior wall of the previously unused floor space. The pop-out added approximately 684 square feet to the premises, increasing the total area by approximately 15 percent.

Construction of the project commenced on September 27, 1990. At that time, Franksen knew that a lease for the premises had not been executed. On October 9, Simon sent Hawbaker a "hold harmless" letter, authorizing him to commence construction before execution of the lease. Franksen received a copy of this letter on or about October 15. The letter granted permission to commence construction, provided that (1) the final set of plans was approved by Simon, (2) the requisite permits and approvals from local boards were obtained by Hawbaker, and (3) Hawbaker provided the certificates of insurance and deposit required under the lease. Hawbaker was requested to acknowledge his agreement with these provisions by signing the letter and returning it to Simon. Simon received a signed copy of the letter from Hawbaker on October 22. The record reveals that the final drawings were not approved by Simon until November 7, and Hawbaker never provided proof of the required insurance.

Hawbaker, in his capacity as president of GEI, executed the lease agreement on October 23, 1990. However, he also deleted the names of the Mulhollands and the Dorwarts as guarantors. Because of these deletions, CJV instructed Hawbaker to either arrange for alternative financing or provide proof of other finan-

cial backing before it would execute the lease. In response, Hawbaker informed CJV that he had obtained a $250,000 Small Business Administration (SBA) loan from an Omaha bank. Kline personally confirmed the existence of the SBA loan through telephone conversations with a bank representative, but did not at that time obtain specific information from the bank regarding disposition of the loan proceeds. He assumed that the entire $250,000 would be utilized to pay construction costs.

In early November 1990, Hawbaker issued checks to Franksen and various subcontractors for partial payment of labor and materials provided for the project. The checks were dishonored because of insufficient funds in the account on which they were drawn. On November 7, Franksen discussed the dishonored checks with Rob Morse, a Simon employee in charge of the day-to-day monitoring of the project. During this same meeting, Franksen told Morse that Hawbaker had attempted to persuade him to obtain false lien waivers from the subcontractors. During the conversation, Morse called someone named "Jim" and, after hanging up, told Franksen that "Simon will pay you guys off, and we'll throw his ass out," in an apparent reference to Hawbaker. Franksen testified that while he did not consider whether Morse had the authority to bind CJV to pay construction costs, he interpreted Morse's comments to mean that Simon would "do the right thing." When Franksen spoke to Morse again the following day, Morse told him to finish the job but did not make any specific reference to payment.

CJV executed the lease on about November 20, 1990, with the knowledge that construction expenses had not been paid and before receiving written confirmation regarding the SBA loan. As executed, the lease incorporated and clarified the terms upon which Kline and Hawbaker had previously agreed. With respect to the payment obligations of CJV, the lease provided that when all construction work required of GEI had been completed, all costs had been paid in full, and satisfactory evidence of the attachment of no liens had been furnished, CJV would "pay to Tenant as Landlord's contribution, if any, for Tenant's Work the sum of $112,000.00 . . . and no more." The lease further provided that "Landlord shall contribute to Tenant the sum of One Hundred Thousand and 00,100 Dollars ($100,000.00), (herein

referred to as 'Tenant Finish Allowance')" in consideration of the tenant's paying additional rental as defined in the lease agreement and conforming to certain other provisions, notably the satisfactory completion of the construction and payment in full of all construction costs. The lease also provided, "Tenant may retain, as Landlord's Contribution to Tenant's Work, fifty percent (50%) of the Minimum Rent otherwise payable to Landlord, until such time as the total sum retained equals $28,000.00."

With regard to payments to the subcontractors, the lease provided:

> Tenant shall furnish evidence satisfactory to Landlord that each sub-contractor has been paid in full upon the completion of the work by such sub-contractor. Tenant shall pay each sub-contractor within 2 weeks following the completion of its specific work. The failure of Tenant to submit such evidence in accordance with this provisions [sic] shall constitute a default under Section 18.1 of this Lease, and, upon such failure, Landlord shall have the right to stop all Tenant's Work in the Premises.

The lease further provided, "Tenant shall not suffer any mechanics' or materialmen's lien[s] to be filed against the Premises or the Center by reason of work, labor, services or materials performed or furnished to Tenant or anyone holding any part of the Premises under Tenant." Finally, the lease provided that "[a]ny alterations, changes, additions and improvements shall immediately upon the termination of this Lease become Landlord's property, be considered part of the Premises, and not be removed at or prior to the end of the Lease Term without Landlord's written consent unless Landlord requests Tenant to remove same." The lease also restated the requirement that GEI provide the $300,000 irrevocable letter of credit in favor of CJV before commencement.

Construction was completed on November 23, 1990, and the restaurant opened on November 25. All materials and services which are the subject of the liens were delivered to the project by the subcontractors between September 27 and November 23. On December 6, Franksen filed a notice of commencement with the Douglas County register of deeds. Mark Reed, an employee of

Simon, sent letters to Franksen and the subcontractors dated December 19, 1990, stating that Simon was preparing to disburse funds for the construction of the restaurant and that lien waivers would be required. Reed testified that while he did not believe that CJV was under any obligation to pay funds directly to the subcontractors, CJV had heard "through the rumor mill" that Hawbaker had outstanding debts with some of his subcontractors, and CJV was therefore willing to disburse the landlord's contribution and loan funds jointly to GEI and the subcontractors in order to resolve the subcontractors' claims. The disbursement was conditioned upon CJV being provided with final lien waivers, but the condition was not met. Reed knew when he sent the letters that the construction debt exceeded $212,000, but the letters did not indicate Hawbaker was responsible for a portion of the payments. Various subcontractors testified that when they received the December 19 letter, they believed CJV or Simon was going to pay them in full for their services. The disbursements contemplated in Reed's letters were not made because shortly after the letters were mailed, Reed was instructed by Simon's legal and leasing departments not to proceed.

When no payment was made, Franksen filed a construction lien on the property on January 22, 1991. The lien included the amounts due to each of the subcontractors for labor, material, and services provided for the project. The subcontractors filed their respective liens on various subsequent dates, all within 120 days after the final furnishing of labor, services, and material. On June 4, 1991, GEI was served with a notice of termination of lease for violating the terms of the lease, including the failure to pay rent as due and failure to pay the construction expenses at issue in this case. GEI vacated its leased space on October 31, pursuant to court order, owing CJV rent in excess of $59,000. The eviction order contained a list of improvements which were to remain "for [the] benefit of Crossroads Joint Venture," all of which the subcontractors contend they delivered to the property.

After GEI was evicted, the property remained unused for 15 months until CJV relet it on February 2, 1993, to Robineb, Inc. Robineb leased the space for the purpose of operating a Red

Robin restaurant, but undertook extensive remodeling before commencing its restaurant operation.

Additional facts will be set forth as pertinent to our analysis.

## II. STANDARD OF REVIEW

An action to foreclose a construction lien is one grounded in equity. *Landmark Enterprises v. M.I. Harrisburg Assocs.*, 250 Neb. 882, 554 N.W.2d 119 (1996). In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Putnam v. Fortenberry*, 256 Neb. 266, 589 N.W.2d 838 (1999).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by said rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Seeber v. Howlette*, 255 Neb. 561, 586 N.W.2d 445 (1998); *Smith v. Papio-Missouri River NRD*, 254 Neb. 405, 576 N.W.2d 797 (1998). A trial court's ruling in receiving or excluding an expert's opinion which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Smith, supra.*

## III. ASSIGNMENTS OF ERROR

CJV contends, restated, that the district court erred in (1) receiving the opinion evidence of the subcontractors' expert because of inadequate foundation and (2) finding that the equitable doctrine of merger was applicable, so as to permit enforcement of the construction liens against its fee estate.

## IV. ANALYSIS

Under Nebraska law, where a mechanics' lien attaches only to the leasehold estate and not to the fee, termination of the leasehold estate leaves nothing upon which the mechanics' lien may operate. See *Stevens v. Burnham*, 62 Neb. 672, 87 N.W. 546 (1901). A tenant cannot without the authority of the landlord charge the land with a lien for materials for constructing a build-

ing thereon. *Platner Lumber Co. v. Krug Park Amusement Co.*, 131 Neb. 831, 270 N.W. 473 (1936). However, although a mechanics' lien when filed attaches only to an equitable estate, it may be enforced against the fee after the equitable and legal titles have merged. *Landmark Enterprises, supra*; *Franksen v. Crossroads Joint Venture*, 245 Neb. 863, 515 N.W.2d 794 (1994). The general rule is that where two unequal estates vest in the same person at the same time without an intervening estate, the smaller is thereupon merged into the greater. *Landmark Enterprises, supra*. The doctrine of merger, however, is not favored, and equity " 'will prevent or permit a merger as will best subserve the purposes of justice and the actual and just intent of the parties, whether express or implied.' " *Id.* at 889, 554 N.W.2d at 124, quoting *Franksen, supra*. As a consequence, merger does not always or necessarily result from a coinciding of two unequal estates. *Landmark Enterprises, supra*. In determining whether an equitable merger has taken place, a court is to consider the circumstances of the particular case in the light of equity and good conscience. *Id.*; *Franksen, supra.*

Applying these principles in cases where the fee owner has retaken possession of leased premises after completion of leasehold improvements and the tenant's subsequent default, we have focused upon whether the conduct of the fee owner during the construction of leasehold improvements was such that the owner should be estopped from retaining the benefit of the improvements. For example, in *Harte v. Shukert*, 94 Neb. 210, 142 N.W. 517 (1913), Tolf Hanson leased premises in a two-story building from Gustave Shukert for a period of 10 years beginning April 1, 1908. Under the terms of the lease, failure to pay rent when due gave Shukert the right to declare the lease to be at an end and to take immediate possession of the premises. The lease also provided that any improvements to the premises made by the tenant would revert to the owner at the end of the lease. Hanson hired John Harte to make improvements to the space, with Shukert's consent. Harte began work in November 1907 and completed $70,000 worth of work before Hanson became insolvent in June 1909. When Harte attempted to assert his lien against the fee, Shukert argued that he had terminated the leasehold because on the first day of May, June, and July 1909, he

had made demand for the amount due and unpaid upon Hanson, and that on July 31, he notified Hanson in writing to vacate the premises within 3 days. The evidence established that regardless of these demands, Shukert was aware of the improvements being made to the premises for more than a year, during which time he failed to exact payment of the monthly rentals or attempt to cancel the lease. Instead, he accepted rent after the time for which it should have been paid and permitted the work to continue to the detriment of Hanson and Harte. We determined that because Shukert had not exercised his option to terminate the lease at an earlier date, even though he was aware of the tenant's financial difficulties, he was estopped from asserting the termination of the lease as to the lienholder and that the doctrine of equitable merger applied.

Similar circumstances were presented in *Waite Lumber Co., Inc. v. Masid Bros., Inc.*, 189 Neb. 10, 200 N.W.2d 119 (1972). Masid Bros., Inc. (Masid), was the fee owner of a one-story brick building. It leased half of the building to Chris Verges for use as a restaurant. The lease was for a term of 10 years and provided that all remodeling expenses would be the responsibility of Verges. Masid was to perform some of the work, including bringing utilities to the premises and enclosing open pipes in the building. Verges entered into various agreements with contractors and subcontractors, who performed work on the project. When Verges suddenly abandoned the premises after substantial improvements had been made, the claimants sought to enforce their liens against Masid, with which they had no contract. In determining that the equitable doctrine of merger applied, we noted that notwithstanding its knowledge of the construction in progress and the fact that Verges had defaulted on lease payments during the construction period, Masid did nothing to cancel the lease. Thus, because Masid was aware that Verges was unable to meet his financial obligations earlier but Masid had failed at that time to exercise its right to terminate the lease, we held that Masid was equitably estopped from asserting the termination of the leasehold estate.

We most recently considered the doctrine of equitable merger in *Landmark Enterprises v. M.I. Harrisburg Assocs.*, 250 Neb. 882, 554 N.W.2d 119 (1996). In that case, M.I. Harrisburg

Associates leased unimproved space to Darren Owen for use as a cocktail lounge. Pursuant to a contract with Owen, Landmark Enterprises, Inc. (Landmark), made leasehold improvements for which it charged Owen $73,665. After construction was completed, Owen became delinquent in his lease payments and failed to pay Landmark the remaining $11,285 due for the improvements. Landmark filed a construction lien, and Harrisburg subsequently terminated the lease and relet the premises to another tenant which operated the cocktail lounge, utilizing the leasehold improvements installed by Landmark. In rejecting Landmark's contention that the doctrine of equitable merger permitted enforcement of the lien against Harrisburg, we noted that the facts were distinguishable from *Waite Lumber Co., Inc., supra*, in that the landlord had no duty to pay for any of the improvements and that the tenant's default occurred after construction of the improvements was completed. We did not refer specifically to principles of estoppel, but concluded that while Harrisburg had been enriched by the improvements, such enrichment "is not the result of any wrongdoing on Harrisburg's part." *Landmark Enterprises*, 250 Neb. at 893, 554 N.W.2d at 126. In this context, our reference to an absence of "wrongdoing" was simply a recognition that there were no acts or omissions on the part of the landlord which would operate as an estoppel triggering the doctrine of equitable merger.

In this appeal, CJV contends that the district court erred in applying the doctrine of equitable merger for two reasons. First, it contends that its conduct during construction of the project does not support a finding of estoppel. Second, it contends that the evidence does not support a finding that it was enriched by the improvements, which contention is, in part, based upon an argument that expert testimony on this subject was erroneously admitted. In our de novo review, we will analyze these issues separately.

### 1. ESTOPPEL

In *Franksen v. Crossroads Joint Venture*, 245 Neb. 863, 874, 515 N.W.2d 794, 803 (1994), we characterized the conduct of a fee owner which may trigger an estoppel in the context of the doctrine of equitable merger as the

> voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights

which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who in good faith relied upon such conduct and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract, or of remedy.

We further noted that estoppel in this context "rests largely on the facts and circumstances of the particular case and will be applied where the wisdom and justice of the principle are founded upon equity, morality, and justice in accordance with good conscience . . . ." *Id.* at 875, 515 N.W.2d at 803. We also noted in *Franksen* that although the facts in this case are distinguishable from those of *Harte v. Shukert*, 94 Neb. 210, 142 N.W. 517 (1913), and *Waite Lumber Co., Inc. v. Masid Bros., Inc.*, 189 Neb. 10, 200 N.W.2d 119 (1972), in that the improvements which are the subject of the liens were not made at a time when the tenant in possession was in default for nonpayment of rent, other facts are pertinent to the determination of whether the doctrine of equitable merger should be applied. *Franksen, supra.*

It is apparent from the record that CJV's interest in the project went beyond simply leasing vacant space in its mall. Hawbaker first proposed leasing the space for use as an ice cream parlor, but Kline, acting as an agent of CJV, considered the concept too limited and felt that a full-service restaurant would pose a better business opportunity for both Hawbaker and CJV. Kline persuaded Hawbaker of this and then assisted him in developing the concept for the Graffiti Eatery restaurant. Kline testified that the objective of having the restaurant open in time for the 1990 holiday season was for the mutual benefit of Hawbaker and CJV.

Through Simon, CJV was actively involved in the implementation of the concept which Kline assisted Hawbaker in developing. Particularly significant is the fact that CJV committed its own financial resources to the project by agreeing to lease terms which included a $112,000 "Landlord's Contribution" and a $100,000 "Tenant Finish Allowance" toward the expense of the leasehold improvement construction. As Kline explained, "[w]e loved the concept. So we wanted to find a way to make the deal."

CJV's enthusiasm for the project was further evidenced by its willingness to permit commencement of the construction of the leasehold improvements long before it had executed a lease for the premises. Although Kline testified that CJV would not have permitted construction to go forward if it had perceived a risk that Hawbaker would be unable to pay Franksen and the subcontractors, there is evidence that CJV did not enforce the provisions of its agreement with Hawbaker which were designed to provide assurance of his financial ability to complete the project and that it permitted construction to continue despite knowledge that Hawbaker's financial condition was significantly weaker than had been represented. Although CJV initially required Hawbaker to furnish evidence of $1 million in capital for the project, in part to ensure that there would be funds available to pay for the improvements, it took no steps to verify unaudited financial statements provided by Hawbaker which showed that he had a net worth of $466,600 and that the prospective investors, the Mulhollands and the Dorwarts, had a combined net worth of $888,532. CJV also did not enforce the requirement that GEI was to supply a letter of credit in the amount of $300,000 before the commencement of construction in order to ensure the financial stability of the project.

Although CJV relied heavily upon Hawbaker's representations regarding his financial ability to carry out the project, Kline admitted that "how little [Hawbaker] could do to prove [his] worth to us [w]as constantly the battle that we fought." An unequivocal indication of Hawbacker's financial shortcoming was provided by his submission of the lease that he signed on October 23, 1990, and on which he had deleted references to the Dorwarts and the Mulhollands as investors in the project. Kline described these deletions as a "major red flag," indicating that Hawbaker lacked the financial backing which CJV considered to be essential to the project. Kline described the circumstances then facing CJV as follows:

> We weighed our options, truthfully. Of — well, you know, do we call this whole thing off? Do we not sign — now we're sitting on an executed lease by the tenant. At that point in time, then, construction is well underway. And we're in a jam. In theory. So we had options. Do we stop

the whole process and kill the deal? Or do we find a replacement for Mr. Hawbaker? Or do — you know, what do we do? Do we punt?

CJV chose not to stop construction or to inform Franksen and the subcontractors of this development with respect to Hawbaker's financial stability, which it considered to be "completely unsatisfactory" and "not the deal we made." Instead, it demanded that Hawbaker obtain additional financial backing and resolved that it would stop construction if he failed to do so. After "several weeks" of discussion, during which construction of the leasehold improvements neared completion, CJV accepted verbal assurances that Hawbaker had obtained a $250,000 SBA loan and signed the lease on or about November 20, 1990, with the knowledge that the subcontractors had not been paid for their nearly completed work.

The SBA loan documentation which CJV received on November 21, 1990, disclosed that only $74,000 of the funds was earmarked for improvement costs. The loan agreement also required that a guarantee from a "Gary M. Nachman" be obtained, although Kline testified he did not know Nachman and did not try to contact him. Additionally, the loan agreement specified that Hawbaker must provide evidence of the $212,000 payment by CJV before any loan funds would be paid. Kline did not know if the conditions had been met before the lease was executed, although he testified that had CJV believed Hawbaker lacked financial backing, it would not have let him go forward with the project. The record reflects that the SBA loan was unfunded as of December 5, although the project had been completed at that time.

Throughout the construction period, CJV's representatives were in regular contact with Franksen and periodically approved plans and specifications for the project. During construction, CJV knew or should have known that Hawbaker lacked the financial capacity to pay for the improvements. Nevertheless, CJV failed to convey this information to Franksen and the subcontractors and did not halt construction or enforce its right to a letter of credit as security for its tenant's undertakings.

These facts are similar to those of *Harte v. Shukert*, 94 Neb. 210, 142 N.W. 517 (1913), and *Waite Lumber Co., Inc. v. Masid Bros., Inc.*, 189 Neb. 10, 200 N.W.2d 119 (1972), and distinguishable from *Landmark Enterprises v. M.I. Harrisburg Assocs.*, 250 Neb. 882, 554 N.W.2d 119 (1996), in that CJV had knowledge of its tenant's financial instability during the construction of the leasehold improvement but took no action to halt construction or to alert the subcontractors to the problem. From our review of the record, it is apparent that throughout the construction period, CJV was motivated to a significant degree by a business objective of having a full-service restaurant open for business in its mall during the 1990 holiday shopping season, which could be accomplished only by keeping the subcontractors on the job. Therefore, based upon our de novo review, we conclude that the evidence is sufficient to find that CJV is estopped from retaining any benefit which it may have received from the improvements at the lienholders' expense. We therefore proceed to the question of whether the evidence establishes that CJV in fact realized such a benefit.

## 2. BENEFIT

In *Franksen v. Crossroads Joint Venture*, 245 Neb. 863, 876, 515 N.W.2d 794, 804 (1994), we stated that "[w]hether or to what extent the improvements *actually* enhanced the value of the premises is also a disputed question of fact which must be resolved by the trial court." (Emphasis in original.) However, we have never held that the value of the benefit or enhancement inuring to the landlord must be proved with any degree of mathematical certainty in order for the doctrine of equitable merger to apply. Assuming that the evidence establishes that the landlord has derived some benefit from the leasehold improvements which are the subject of a construction lien, the degree of certainty with which the value of that benefit is established by the evidence must be considered and weighed in light of the principles which underlie the doctrine of equitable merger. In the present case, the subcontractors presented expert testimony as well as other evidence of the benefit to the fee estate resulting from the leasehold improvements. We consider each category of evidence separately.

### (a) Expert Testimony

At trial, the subcontractors called Patrick Morrissey, MAI (a member of the Appraisal Institute), as an expert witness. Morrissey has been a real estate appraiser since 1972, with experience in the appraisal of residential and commercial properties. He is licensed in Nebraska, Iowa, and South Dakota. He testified that utilizing uniform appraisal standards and relying solely upon facts and data reasonably relied upon by other experts in his field, he determined that the value of the leasehold improvements involved in the project as of November 23, 1990, was $237,000. This opinion was received over CJV's foundational objection.

Morrissey's opinion regarding the value of the leasehold improvements consisted of two components. The first involved the value of the additional 684 square feet of floor space resulting from construction of the pop-out. Morrissey determined that the present value of the income stream which would be generated from a 5-year lease of this space, together with the reversionary value of the space at the end of that term, was $74,000. The second component in Morrissey's appraisal involved the extent to which the improvements added to the value of the premises as they existed prior to improvement, exclusive of the pop-out, which Morrissey referred to as the "dry shell." Based upon his consultation with two developers, Morrissey determined that 50 percent of the improvements could be used by a restaurant occupying the space after GEI vacated the premises. Subtracting the value which he attributed to the pop-out from the total construction costs, and applying the 50-percent reuse factor, Morrissey determined that the improvements enhanced the value of the dry shell in the amount of $163,000. Morrissey then added the value he had determined for the pop-out and the amount by which he determined that the improvements enhanced the value of the dry shell to arrive at a total of $237,000. He testified that this constituted an acceptable technique in valuing the improvements. However, he admitted on cross-examination that his method of appraisal did not reflect actual income or savings realized by CJV from the improvements.

CJV contends that Morrissey's opinions should have been excluded because (1) he utilized a 5-year lease term instead of a 15-year term in determining the income stream from the pop-out, (2) the properties which he used in determining the residual value of the pop-out were not comparable, (3) his analysis of the enhancement to the value of the dry shell did not take into consideration actual circumstances and was made without information regarding the cost of the pop-out improvements, and (4) he failed to determine the value of the improvements as of October 31, 1991, the date on which CJV regained possession of the leased premises.

 Admissibility of expert testimony is based on four factors: (1) whether the witness is qualified as an expert; (2) whether the testimony is relevant; (3) whether the testimony will assist the trier of fact; and (4) whether the probative value of the testimony, even if relevant, is outweighed by the danger of unfair prejudice or other considerations. *Phillips v. Industrial Machine, ante* p. 256, 597 N.W.2d 377 (1999); *Seeber v. Howlette*, 255 Neb. 561, 586 N.W.2d 445 (1998). Expert testimony should not be received if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture. *Langfeld v. Department of Roads*, 213 Neb. 15, 328 N.W.2d 452 (1982). Regarding the use of comparable sales by an expert in real estate appraisal, we have stated:

> " 'Whether the properties are sufficiently similar to have some bearing on the value under consideration, and to be of any aid to the jury, must necessarily rest largely in the sound discretion of the trial court, which will not be interfered with unless abused. The exact limits, either of similarity or difference, or of nearness or remoteness in point of time, is difficult, if not impossible, to prescribe by any arbitrary rule, but must to a large extent depend on the location and the character of the property and the circumstances of the case.' "

*Id.* at 28, 328 N.W.2d at 459, quoting *Clearwater Corp. v. City of Lincoln*, 207 Neb. 750, 301 N.W.2d 328 (1981), and 5 Nichols on Eminent Domain § 21.31 (1979). ·

Morrissey testified that his opinions were formulated through the use of uniform appraisal methods and based upon information and data generally relied upon by experts in his field. He stated that the use of a 15-year term would not have made a difference in his calculation of the income stream attributable to the pop-out. He further stated that the sales which he utilized as comparable were the best he could find and, in his judgment, adequate for his purpose of determining the residual value of the pop-out improvements. We conclude that Morrissey had an adequate factual basis for his opinions and that the factual discrepancies urged by CJV go to the weight to be given to those opinions both by the district court and by this court on de novo review. As noted above, the precise amount by which the value of the fee estate was enhanced by the leasehold improvements is not an ultimate issue of fact to be determined in this case. Accordingly, we conclude that the district court did not abuse its discretion in receiving Morrissey's opinions.

(b) Other Evidence of Benefit to Fee Estate

As we have noted, the leasehold improvements at issue included the pop-out, a permanent structural modification which increased the area of the premises by approximately 15 percent. As Kline described it, "[w]e grew the building." This modification was included in CJV's original design of the mall but was not carried out until 1990 as a part of the project. Thus, the pop-out was of at least some benefit to the fee.

Additionally, had the costs of the leasehold improvement construction been paid and lien waivers obtained by GEI as required by the lease, CJV would have become obligated under the lease to pay GEI $112,000 as its contribution toward the work and to loan GEI an additional $100,000. The failure of GEI to pay for the improvements and obtain lien waivers absolved CJV of that contractual obligation but did not prevent the utilization of the improvements in the Graffiti Eatery restaurant while it was situated and operating in the Crossroads Mall. When CJV took possession of the premises after GEI defaulted, it did not permit the subcontractors to enter for the purpose of salvaging materials for which they had not been paid. These facts further demonstrate some benefit to CJV.

CJV contends that the extensive remodeling undertaken by its subsequent tenant before opening the Red Robin restaurant on the leased premises demonstrates that it received no benefit from the GEI leasehold agreement. However, the record reflects that the Red Robin remodeling was made pursuant to a contract between Robineb and Lindburg Construction Co., Inc., to which CJV was not a party. The lease to Robineb provides that it accepts the premises in an "as is" condition, except that CJV agreed to modify one wall at a cost not to exceed $54,000. All other modifications were specified to be at Robineb's sole expense. The lease contains no other provision requiring CJV to contribute to the cost of the leasehold improvements, nor does it provide for a loan in the form of a "tenant finish allowance," as did the GEI lease. Thus, CJV realized a benefit in that it has a full-service restaurant operating in the space originally improved by the subcontractors at a cost significantly less than it would have incurred under the GEI lease if the subcontractors had been paid on a timely basis.

## V. CONCLUSION

Based upon our de novo review, we conclude that the value of the fee estate was enhanced by labor and materials supplied by the subcontractors and that by virtue of its conduct throughout the construction period as discussed herein, CJV is estopped from asserting the termination of the lease as a defense to the subcontractors' claims. Considering, as we must, the circumstances of this particular case in light of equity and good conscience, we determine that the doctrine of equitable merger is applicable and that the property of CJV is therefore subject to the liens which are the subject of this action. The judgment of the district court is affirmed.

AFFIRMED.

MILLER-LERMAN, J., not participating.